UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § § § |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § § § |
| PLAINTIFFS | § § |
| v. | § § § |
| BRAD LIVINGSTON, individually and in his official capacity, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § |
| DEFENDANTS | § |

CIVIL ACTION NO. 3:13-cv-217
JURY DEMANDED

**PLAINTIFFS' COMPLAINT**

Plaintiffs, surviving family members of three men who died in Texas Department of Criminal Justice ("TDCJ") prisons, bring this lawsuit to prevent more men from dying of heat stroke in the brutally hot TDCJ Gurney Unit and seek redress for their relatives who perished at the Gurney Unit.

STATEMENT OF CLAIMS

1.  Prisoners are regularly dying of heat stroke in TDCJ custody at the Gurney Unit in Tennessee Colony, Texas.

2.  The survivors of three men, who have died, Douglas Hudson, Kenneth Wayne James, and Rodney Adams, bring claims individually, as heirs-at-law and as statutory wrongful death beneficiaries against Defendants for the deaths of their family members.

3.  Plaintiffs claim that the Defendant individuals are liable, under 42 U.S.C. §1983, for violating their deceased relatives' constitutional rights under color of law, in violation of the Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment.

4.  Plaintiffs further claim that TDCJ and University of Texas Medical Branch ("UTMB") caused their loved-ones' deaths by failing to provide reasonable accommodations for their disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the ADA Amendments Act ("ADAAA"), 42 U.S.C. §12131 *et seq.*, and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act").

JURISDICTION AND VENUE

5.  This *C*ourt has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights).

6.  Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1), as Defendant UTMB is based, and operates, in this district and division, and all Defendants reside in this state.

PLAINTIFFS

**A.  Rodney Adams Survivors**

7.  Ashley Adams is Mr. Adams' daughter and sole surviving heir. She sues in her individual capacity and as the sole heir-at-law to Mr. Adams' estate and as a statutory beneficiary under the Texas Wrongful Death Act. Mr. Adams died intestate, and there were no

probate proceedings arising from his death, as none were necessary. She is a resident of Parker County, Texas.

8.    Wanda Adams is Mr. Adams' mother, and a statutory beneficiary under the Texas Wrongful Death Act. She resides in Wise County, Texas.

**B.  Kenneth Wayne James Survivors**

9.    Carlette Hunter James, surviving spouse of Mr. James, sues in her individual capacity and as an heir-at-law of Mr. James' estate, and as a statutory beneficiary under the Texas Wrongful Death Act. At the time of his death, Mr. James had six adult children (and no minor children). He died intestate, and there were no probate proceedings arising from his death, as none were necessary. Ms. Hunter is a resident of Lubbock County, Texas.

10.    Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans are the surviving adult children of Kenneth Wayne James. They sue in their individual capacities and as heirs-at-law of Mr. James and statutory beneficiaries under the Texas Wrongful Death Act. All, except Arlett James and Jonathan James, reside in Lubbock County. Arlett James lives in Denton County, Texas; and Jonathan James, in Los Angeles County, California.

11.    Mary Lou James is the mother of Mr. James, and sues in her individual capacity as a statutory beneficiary of the Texas Wrongful Death Act.  She is a resident of Lubbock County.

**C.  Douglas Hudson's Survivors**

12.    Cade Hudson is Mr. Hudson's son and surviving heir. He sues in his individual capacity and as an heir-at-law to Mr. Hudson's estate and a statutory beneficiary under the Texas Wrongful Death Act. Mr. Hudson died intestate, and there were no probate proceedings arising from his death, as none were necessary. Cade Hudson is a resident of Texas.

DEFENDANTS

13. Brad Livingston is the executive director of TDCJ. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Livingston is a resident of Huntsville, Texas, in Walker County. He can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

14. Rick Thaler is the director of TDCJ's Correctional Institutions Division, which manages all aspects of TDCJ's prison facilities. As such, Thaler is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, and can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

15. William Stephens is the deputy director of the Correctional Institutions Division. As such, Stephens is the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official

representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, and can be served process at 861-B, IH-45 North, Huntsville, TX 77320.

16.   Robert Eason was the regional director for TDCJ's Region II, and supervises eleven prisons, including the Gurney Unit. As regional director, he is responsible for the supervision of all personnel at the Gurney Unit. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason resides in Anderson County, Texas.

17.   Defendant Dennis Miller was the warden at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages.

18.   The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Gurney Unit, a public facility with programs and services for which the deceased and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. It can be served process by serving Brad Livingston, its executive director, at 861-B, IH-45 North, Huntsville, TX 77320.

19.   The University of Texas Medical Branch, located in Galveston, is a component of the University of Texas system. UTMB's high-ranking policymakers reside and work in Galveston. Through its Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including prisoners at the Gurney Unit. UTMB is a recipient of federal funds, and is sued for declaratory, and compensatory relief under federal law. It can be served process by serving its president, David L. Callender, at 301

University Blvd., Suite 6.100, Administration Building, Galveston, TX 77555-1006.

FACTS

**Extreme Temperatures are Killing Texas Prisoners**

20.   According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year."  On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." Three of those victims, Douglas Hudson, Kenneth Wayne James and Rodney Adams, died at TDCJ's brutally hot Gurney Unit.

21.   Like most other TDCJ units, the Gurney Unit inmate living areas are not air conditioned, and apparent indoor temperatures routinely exceed 100 degrees. These temperatures last late into the night, providing no relief to prisoners. Even early in the morning, indoor apparent temperatures are sweltering.

22.   As each of the Defendants named individually have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2011, temperatures this elevated cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

23.   In fact, TDCJ and UTMB incorporated this chart, prepared by the National Oceanic and Atmospheric Administration, into agency policies well before 2011.



24.  The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

25.  The indoor apparent temperatures routinely reach the red "extreme danger" zones indoors at the Gurney Unit. According to NOAA, when the apparent temperature reaches "extreme danger," heat stroke is "imminent." Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

26.  It was well known to TDCJ and UTMB leadership that people with certain medical conditions, like diabetes or hypertension, or who take certain medications, like psychotropics or diuretics, are much more vulnerable to extreme temperatures. While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people

with these medical conditions and disabilities. Their medical conditions prevent their bodies

from regulating their temperature, putting them at much greater risk of death.

27.  Since 2007, thirteen men have died in TDCJ prisons from heat-related causes:

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|------|---------------|------------|-------------|-------|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, in-carcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found at 3:30am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |

28.  In fact, it is likely that there were more heat related injuries and deaths as

hyperthermia is known to be an underreported cause of death by medical examiners and

pathologists.

29.  These thirteen men all shared certain characteristics. Most took psychotropic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Many arrived in non-air-conditioned TDCJ facilities, like the Gurney Unit, shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night, or were found dead early in the morning. And they all died in late July and early August – the hottest days of the Texas summer.

30.  Eight of these men, including Mr. Hudson, Mr. James, and Mr. Adams, lived in prisons in TDCJ's Region II – where Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death.

31.  Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he believed TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he and Miller took no action to protect future prisoners, like Mr. James and Mr. Adams, in the face of TDCJ's obviously inadequate procedures.

32.  Eason's direct supervisors, Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke at the Gurney Unit and system wide were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason. Even though the existing policies were obviously inadequate, Thaler, Stephens, and Eason continued to follow the same deadly course of conduct. Air conditioning the Gurney Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

33.  Nor did Executive Director Livingston take steps to cool the non air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years.

In fact, even today Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions.

34.   These hazardous conditions serve no penological purpose.

**The Gurney Unit is Especially Deadly**

*The Gurney Unit's Prisoner Housing is Not Air Conditioned or Cooled*

35.   Though extreme indoor temperatures at the Gurney Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Eason, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Gurney Unit.

36.   The Gurney Unit's windows are sealed shut, and cannot be opened to provide additional ventilation. The prison housing areas are like an oven.

37.   Moreover, Defendants TDCJ, Livingston, Thaler, Stephens, Eason and Miller have chosen not to take such action even though they know many prisoners have medical conditions that make the extreme heat deadly.

38.   There are some parts of the Gurney Unit where prisoners could live, at least until they receive the critical intake physical to identify which prisoners suffer from heat-sensitive medical conditions. But TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason and Miller, do not take any steps to house prisoners with heat-sensitive conditions in those areas.

39.   Additionally, certain areas, like the offices of Livingston, Eason, Stephens, Thaler, and Miller, are air-conditioned – a comfortable 75 degrees. TDCJ even air-conditions the armory at the prison because it considers possible damage to its weaponry more important than possible, or even likely, death to the inmate population.

40.   Despite their knowledge of the dangers temperature above 90° Fahrenheit pose to prisoners, TDCJ and UTMB policies only provide protections from heat to inmates performing

outdoor prison labor. For example, if a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." TDCJ's policy, however, makes *no* accommodations for prisoners' housing assignments, or locations where they are required to live, even though temperatures in living areas routinely reach the "extreme danger" zone. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

41. UTMB makes mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies do not contemplate special housing for prisoners with heat-sensitive disabilities.

42. Defendants also chose not to provide prisoners at the Gurney Unit, including Mr. Hudson, Mr. James, and Mr. Adams opportunities to cool off in an air-conditioned environment. Though some parts of the Gurney Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners were not given a chance to cool off.

43. And despite the fact that more than ten prisoners have died from heat stroke, Eason has said he considers adding any air conditioning to TDCJ's prisons a waste of money.

*People with Medical Conditions That Decedents Suffered From Are Especially Vulnerable to Extreme Temperatures*

44. TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

45. TDCJ and UTMB policies specifically acknowledge certain medical conditions like cardiovascular disease and psychiatric conditions affect heat tolerance.

46. TDCJ also advises its employees that an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain

medications," including diuretics and psychotropics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhumane conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

47. Unfortunately, many TDCJ inmates have had to suffer through these inhumane conditions, including Mr. Hudson, Mr. James, and Mr. Adams, and the other men who have died.

48. TDCJ officials, including Livingston, Thaler, Stephens, Eason and Miller know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury.

*Prisoners at the Gurney Unit – A Transfer Facility - Are Not Acclimated to Extreme Temperatures*

49. The Gurney Unit is a transfer facility, where people are processed into the prison system. Like the deceased relatives of some of the Plaintiffs, most TDCJ prisoners, arrive at transfer facilities from county jails.

50. People whose bodies are not acclimated to the heat are at much greater risk of death. In fact, TDCJ and UTMB policies recognize "acclimatizing staff and [prisoners]" as necessary to prevent heat stroke. But when the body is exposed to extreme temperatures without acclimation, the risk of injury or death markedly increases.

51. In contrast to TDCJ facilities, Texas county jails are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 TEX. ADMIN. CODE §259.160. Thus, when prisoners arrive from temperature controlled jails to the brutally hot Gurney Unit, the Defendants know they are at heightened risk of heat-related injury or death.

52. Many of the prisoners who have died of heat stroke actually spend only a few days in TDCJ custody. The two prisoners who died in 2007, for example, spent less than a week at the Byrd Unit before the heat killed them.

53. Mr. Hudson was at the Gurney Unit just four days before he died.

54. Mr. James died less than three days after arriving at the Gurney Unit.

55. Mr. Adams arrived at the Gurney Unit one day, and died after less than 24 hours.

*Gurney Unit Prisoners Cannot Access Fans, Cups, and Shorts*

56. Not only is it brutally hot and difficult to acclimate, inmates at transfer facilities also cannot immediately access the prison commissary pursuant to TDCJ policy. Thus prisoners can not even purchase items to help combat the heat – like fans, light-weight clothing and shorts, and even cups to drink water from. Until a prisoner can access the commissary, he cannot even get a cup to drink water, much less shorts to wear or a fan to try and cool the air.

57. Moreover, Defendants do not even permit personal fans at the Gurney Unit.

58. And not only are prisoners deprived of cups at the Gurney Unit, Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures indoors. TDCJ policy requires officers only to bring one large jug per fifty-four prisoners to the prisoner living areas (at most) three times a day. Throughout the system, and at Gurney, the jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and are frequently filled with lukewarm water. While Director Eason has stated the provision of water should occur as much as possible and should not be limited to three times a day, the provision of sufficient water to stay hydrated did not occur at the Gurney Unit.

59. Thus, even the grossly inadequate measures TDCJ purports to rely on to help prisoners cope with heat were unavailable at the Gurney Unit.

*TDCJ and UTMB Fail to Timely Identify Heat-Sensitive Medical Conditions*

60.   Just as importantly, it can take up to ten days for prisoners to receive an intake physical when they come into TDCJ custody. The intake physical is critical, because it is the first opportunity for UTMB and TDCJ to identify and treat prisoners' heat-sensitive medical problems. At Gurney, and throughout TDCJ facilities it serves, UTMB fails to even check to see if a prisoner suffers from a heat-sensitive medical condition. Thus, UTMB and TDCJ do not know they need to provide any accommodations to a specific prisoner, such as additional observation by correctional officers, rapid treatment when a problem is identified, or placement in cooler, safe confines.

61.   As a consequence of this policy, UTMB and TDCJ routinely fail to make sure prisoners receive these essential physical examinations promptly, even during the extremely hot summer months. This loophole leaves inmates with heat sensitive conditions and disabilities, such as decedents, in grave danger.

62. TDCJ also know how important the physicals are concerning such medical conditions. TDCJ will not even allow a prisoner to labor outside until the prisoner has had the intake physical. Until UTMB conducts the physical, newly arrived prisoners are especially vulnerable to death because they receive no accommodations for their heat-sensitive disabilities.

63.   And despite knowing that prisoners like decedents were in grave danger, TDCJ fails to house newly-arrived prisoners, who are awaiting a UTMB intake physical, in the air-conditioned parts of the prison or rotate prisoners, who have not had their physicals, through the air-conditioned areas to provide some respite. Moreover, they fail to do this despite having access to their medical records.

64. To put it simply, TDCJ officials, like Eason, Thaler, Stephens, Miller and Livingston, know that TDCJ and UTMB fails to immediately identify prisoners with heat-

sensitive medical conditions and know that this failure endangers prisoners, yet they have done nothing to correct it.

*Correctional Officers at the Gurney Unit are Inadequately Trained*

65. Because the apparent temperatures are so elevated, it is imperative TDCJ's low-level employees recognize heat-related illnesses and provide prisoners with emergency medical care when needed. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A memo devoid of solutions or real instruction is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated or emphasized after Mr. Shriver and Mr. Robles died in 2007 -- or, shamefully, after the ten prisoners died in 2011.

66. UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though, when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

67. As the warden and regional director, respectively, Miller and Eason are directly responsible for training the front-line officers charged with protecting prisoners' lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate training. Each failed to provide meaningful training, and many people died as a consequence.

*When Men Died in 2007, TDCJ and UTMB Failed and Refused to Make Changes*

68. Two TDCJ and UTMB's victims died at another TDCJ transfer facility in 2007 – the Byrd Unit. The first prisoner to die, James Shriver, was at the Byrd Unit less than 24 hours before he died. Though he had served several years in prison, he came to Byrd on the afternoon

of August 7, 2007, from an air-conditioned TDCJ inpatient mental-health facility. Shortly before 5:00 am the next day, officers found him dead in his cell.

69.   Less than a week later, a second man died of heat stroke at the Byrd Unit. Dionicio Robles also came to the Byrd Unit from an air-conditioned TDCJ inpatient mental-health facility. He arrived at the Byrd Unit on August 3, 2007. He was dead less than ten days later. He was also found dead in his cell shortly before 5:00 am.

70.   Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

71.   Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Thaler, Stephens, and Eason – all of whom knew about the deaths. But even though two men died under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they continued to operate TDCJ with individuals in its care to temperatures they knew endangered human life.

*As Men Died in 2011, TDCJ and UTMB Still Failed and Refused to Make Changes*

72.   The first TDCJ prisoner confirmed to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk at the Hutchins Unit, another TDCJ transfer facility, which Eason supervises, on July 22, 2011. He was hospitalized until life-support was withdrawn on July 28, 2011.

73.   Mr. McCollum had not received an intake physical from UTMB, and had been unable to acclimate his body to the increased heat. He was left to die.

74.   Douglas Hudson was found unconscious, on July 24, 2011, due to heat stroke at the Gurney Unit. When he received medical attention at the prison his body temperature was 105

degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011.

75.    A few days later, an email was sent to Gurney Unit employees, including Miller, informing him "it is imperative that we take an aggressive proactive approach to the heat related issues we are currently facing due to the extreme temperatures." Despite this recognition of the life-threatening situation at the prison, Livingston, Thaler, Stephens, Eason, and Miller failed and refused to make any changes to protect prisoners' lives at Gurney.

76.    Later that day, Thomas Meyers, 46, died at the Coffield Unit from heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. Eason supervises the Coffield Unit.

77.    The next day, Robert Webb, 50, died  at the Hodge Unit from heat stroke. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him very susceptible to heat stroke. Eason supervises the Hodge Unit.

78.    Later that week, Alexander Togonidze, 44, died of a heat stroke at the Michal Unit – another prison Eason supervises. Mr. Togonidze had even been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

79.    That same day, Charles Cook, 53, collapsed and died from a heat stroke at the Hodge Unit, and Michael Martone, 57, died at the Huntsville Unit from heat stroke.

80.    A few days later, Kelly Marcus, 36, died from heat stroke at the Connally Unit.

81.    On August 13, 2011, Mr. James died at the Gurney Unit. Once again, as after prior deaths, Livingston, Thaler, Stephens, Eason, and Miller failed and refused to make changes necessary to prevent heat deaths.

82.    Approximately one year later, Mr. Adams died at the Gurney Unit from heat stroke.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

83.  Livingston, Thaler, Stephens, Eason, Miller, TDCJ and UTMB (and its highest executives like Owen Murray, Charles Adams, and its governing board) knew indoor temperatures in TDCJ facilities regularly exceeded 95 degrees during the hot Texas summers, but failed and refused to take reasonable steps to protect the health and safety of prisoners.

84.  And Livingston, Thaler, Stephens, Eason, and Miller all knew inmate living areas at the Gurney Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 100 degrees indoors.

85.  Livingston, Thaler, Stephens, Eason, and Miller (and UTMB executives Owen Murray and Charles Adams) knew that extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with hypertension and diabetes in extremely hot facilities like the Gurney Unit. TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, and Miller implemented (and could have changed), make no accommodation for people with hypertension or diabetes during periods of extreme temperatures.

86.  Though Livingston, Thaler, and Stephens work in Austin and Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months. Eason and Miller worked at the Gurney Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.

87.  UTMB executives, including Owen Murray and Charles Adams, work in Galveston, and also experience extreme temperatures during the Texas summer.

88.  Additionally, Eason, Miller, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these reasing are routinely above 90° at all times during the summer months. Incredibly, despite their knowledge of these dangers, TDCJ

has no policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas.

89.   Instead of having a formal policy, TDCJ relies on an informal email discussing the extreme temperatures indoors. But while this email acknowledged the dangers of heat to prisoners, it does not provide for any way to protect a prisoner with heat-sensitive medical conditions from extreme temperatures. Instead, it relies on measures proved inadequate when men died in 2007, like increasing water intake and providing additional fans, neither of which occurred at the Gurney Unit.

90.   Stephens and Thaler claim to send the email in May of each year to remind wardens and regional directors to begin to take heat-safety precautions. The email is recycled each year – the text is virtually identical, and has not changed even when men began to die. Livingston, Thaler, Stephens, Eason and Miller know the measures described in the email are inadequate, but have taken no action to improve TDCJ's response to heat-related emergencies.

91.   High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes as far back as 1999. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

92.   In addition, Livingston was a named defendant in *Blackmon v. Kukua*. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit, another TDCJ transfer facility. *Blackmon* went to trial in February 2011, just a few months before men began dying at the Gurney Unit.

93. High-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician, testified the extreme temperatures did not violate Mr. Blackmon's rights, despite knowing as a doctor that extreme heat endangers many prisoners. He flippantly said "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away." In other words, UTMB – in the face of people dying from heat stroke at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

94. In 2011, the day before Mr. James died (and a year before Mr. Adams died), State Representative Sylvester Turner, the former chair of the Texas Criminal Justice Subcommittee, wrote a letter to Livingston expressing his concern about the high temperatures in TDCJ prisons, that "temperatures inside cells have reached as high as 120 degrees during the day and do not fall below 100 degrees at night." He asked TDCJ to take "any and all preventative measures … to ensure that inmates and guards inside TDCJ do not suffer."

95. Livingston instructed his surrogates, including Thaler, to write back to Rep. Turner, but failed and refused to make any changes to TDCJ's operations.

96. Livingston was also sued in *McCollum v. Livingston*, a wrongful death case that was filed a few weeks before Mr. Adams' death. Mr. McCollum died after suffering a heat stroke at TDCJ's Hutchins Unit – another Region II transfer facility.

97. Likewise, in summer 2012, before Mr. Adams died there was intense media coverage of the extreme temperatures in Texas prisons. The *New York Times*, *Houston Chronicle*, and *Fort Worth Star Telegram* all editorialized TDCJ should not expose prisoners to these extreme conditions. But Defendants did nothing to cool down the Gurney Unit and left inmates, including the decedents in danger.

98. As the conditions at the Gurney Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like the three decedents here, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed, and continue to pose, a life-threatening health risk.

99. Yet, rather than seek to have the housing areas cooled by air conditioning, a cooling alternative, or to make accommodations for inmates to cool down, or to make sure inmates with serious medical conditions such as diabetes or hypertension were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat.

100. TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason and Miller routinely review the EAC reports generated at the facilities they supervise. These reports would have shown them prisoners and staff were suffering heat-related injuries every summer at the prison. These Defendants reviewed the EAC reports for all of the heat related deaths described herein.

101. UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, and Miller – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Gurney Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Eason, and Miller were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

102. Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to address these conditions.

103. At the time of the deaths of Mr. Hudson, Mr. James, and Mr. Adams, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Eason, and Miller are not entitled to qualified immunity.

104. The conditions at the Gurney Unit result in gratuitous pain and suffering for all prisoners, and pose an imminent danger of serious physical illness, injury, or death to Mr. Hudson, Mr. James, and Mr. Adams, as well as to prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest. Rather, they endanger the lives of the weakest, sickest, inmates in TDCJ custody.

**Plaintiffs' Decedents Had Disabilities**

*Hypertension*

105. Hypertension is a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

106. As Defendants well know, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

107. Diuretic medications are frequently used to treat hypertension. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. UTMB and TDCJ policies recognize diuretics increase a patient's risk of heat stroke.

108. Beta blockers are also used to treat hypertension. These drugs reduce the body's ability to sweat, which is necessary to dissipate heat. An inability to perspire normally substantially increases a person's risk for heat-related illnesses and death.

109.  As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limited the operation of one's respiratory, circulatory, and cardiovascular systems.

*Depression*

110.  Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the neurological system.

111.  UTMB policy recognizes patients taking medications like Cogentin, antihistamines (like Visatril), and beta-blockers (like Lopressor), are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

112.  TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason and Miller, know that many prisoners with hypertension and depression live in Texas prisons.

113.  Here, TDCJ and UTMB discriminated against Mr. Hudson, Mr. James, and Mr. Adams, by denying them reasonable accommodations necessary to allow them access TDCJ and UTMB's programs and services. The extreme heat in TDCJ facilities denies people like Mr. Hudson, Mr. James, and Mr. Adams access to TDCJ facilities.

**Douglas Hudson's Death**

114.  In the 38 days before Mr. Hudson's death, the temperature at the Gurney Unit exceeded 100 degrees Fahrenheit on 30 days.

115.  Mr. Hudson arrived at the prison on July 20, 2011. He was serving a short prison sentence for driving while intoxicated. The temperature that day reached 101 degrees.

23

116.  Mr. Hudson suffered from depression and hypertension, and was prescribed Elavil (amitriptyline), a tricyclic antidepressant, and Lopressor (metoprolol), a beta-blocker. UTMB policy recognizes prisoners taking Lopressor are at heightened risk of heat stroke.

117.  On July 24, 2011, Mr. Hudson was found unconscious, barely breathing, in his cell. That day, the temperature reached 104 degrees, with a heat index of over 106 Fahrenheit.

118.  Mr. Hudson was sent to the infirmary at the adjacent Beto Unit. His body temperature was 105. The nurses at Beto determined Mr. Hudson needed to go to an emergency room as soon as possible.

119.  Unfortunately, by the time Mr. Hudson arrived at the hospital, it was too late. He died shortly after arriving.

**Kenneth James' Death**

120.  At the time of his death, Mr. James was a 52-year-old man. He was overweight, and suffered from hypertension. He had violated a probation condition, and was sentenced to serve a five-year sentence in TDCJ custody.

121.  Mr. James arrived at the Gurney Unit from the air-conditioned McLennan County Jail on or about August 10, 2011.

122.  At the Gurney Unit, a UTMB nurse noted his hypertension, and that he was taking a diuretic, hydrochlorothiazide, to treat his disability. He did not receive an intake physical.

123.  On the day Mr. James died, the Tennessee Colony area, where the Gurney Unit is located, had endured 43 consecutive days where the temperature exceeded 100 degrees. The heat index in the Tennessee Colony area was "extremely dangerous" on 51 consecutive days before Mr. James' death.

124.  During the few days Mr. James spent at the Gurney Unit, outdoor temperatures reached 106 degrees Fahrenheit. Temperature readings taken inside the Gurney Unit the day before Mr. James died showed temperatures exceeding 101 degrees.

125.  Around 2:45 am in the morning of August 13, 2011, Mr. James was behaving strangely. He was observed urinating on a wall, and spoke incoherently to security officers. At 3:05 am he became unresponsive, and was taken to a nearby emergency room at Palestine Regional Medical Center.

126.  When Mr. James arrived at the hospital, his body temperature was 108 degrees. The extreme heat caused him to suffer organ failure, and he was pronounced dead within an hour.

127.  An autopsy concluded he died of "environmental hyperthermia-related classic heat stroke" due to "lack of air conditioning, chronic illness, and use of diuretics and beta blockers." The high temperatures caused "all cellular structures" to be "destroyed" in Mr. James' body.

**Rodney Adams' Death**

128.  At the time of his death, Mr. Adams was a 45-year-old man. He had been convicted of driving while intoxicated, and was sentenced to serve four-years in TDCJ.

129.  On the day Mr. Adams died, the Tennessee Colony area, where the Gurney Unit is located, had endured 19 consecutive days where the temperature exceeded 90 degrees Fahrenheit. During the few days Mr. Adams spent at the Gurney Unit, outdoor temperatures reached 103 degrees.

130.  He arrived at the Gurney Transfer Facility from the air-conditioned Wise County Jail on or about August 2, 2012. That day, temperature readings taken inside the Gurney Unit showed temperatures exceeding 102 degrees Fahrenheit.

131. When he arrived, an UTMB employee noted he was taking a psychotropic medication to treat depression. He had been prescribed Vistaril (also known as hydroxyzine, an

antihistamine), Cymbalta (duloxetine, a selective serotonin and norepinephrine inhibitor, or SSRNI), and Cogentin (benztropine, an anticholinergic used to treat side effects of other drugs).

132.  Mr. Adams had suicidal thoughts and experienced hallucinations when he was not taking his medication. For example, shortly after he arrived at the Wise County jail, on July 2, 2012, Mr. Adams wrote to jailers "please let me talk to MHMR about my mental problems, I am feeling the presence of death!" He later wrote "I need to see my caseworker and doctor from MHMR for my mental state. I am hearing and seeing people and voices."

133.  Mr. Adams' medication was necessary to protect his mental health from his disability. Without it, he was unable to perform major life activities like caring for himself, sleeping, concentrating, and thinking.

134. On the night of August 3, 2012, the Tennessee Colony area experienced temperatures over 90 degrees until after 10pm. That day, the heat in Tennessee Colony was sweltering – 100 degrees Fahrenheit, with 32 percent humidity. According to NOAA's chart, which TDCJ and UTMB rely upon, temperatures this high makes heat stroke "possible," and are "dangerous."

135.  On the afternoon of August 3, 2012, Mr. Adams returned from eating at the cafeteria with the other men housed in his dorm. Suffering from the extreme temperatures, he began to feel dizzy, and lay down.

136.  Mr. Adams suffered a heat stroke, and his body began convulsing. Other prisoners held him down, so he would not hurt himself, and called for help.

137.  At about 6:15 pm, Mr. Adams was taken on a stretcher to the prison's infirmary. His body temperature was 109.9 degrees, he was vomiting; and his breath was very shallow.

138.  He was unresponsive. UTMB staff called 911. The EMTs who arrived noted Mr. Adams body was "very hot to the touch."

139.  Mr. Adams was taken to the Palestine Regional Medical Center. When he arrived there, his body temperature was 107.9 degrees. Doctors diagnosed him with "severe hyperthermia."

140.  Shortly before midnight, he was transferred by helicopter to the East Texas Medical Center. When he arrived, his temperature had only come down to 104 degrees, despite his body being packed in ice and doctors administering IVs of cold fluid.

141.  Doctors at the East Texas Medical Center noted his "overall prognosis was very poor and critical." He was diagnosed with "heat stroke" causing "severe brain injury," and "respiratory failure." The extreme heat caused him to suffer organ failure, and life support was withdrawn after doctors consulted with Mrs. Adams. He passed away shortly thereafter.

142.  A doctor who evaluated Mr. Adams at the Medical Center wrote this was "a very unfortunate situation of a 45-year-old inmate who was apparently perfectly well," until he was exposed to "the extremely hot conditions within the holding tank" at the prison.

143.  An autopsy concluded he died of "hyperthermia," or heat stroke, resulting in multi-system organ failure.

CAUSES OF ACTION

A. EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Eason, and Miller Only,
in Their Individual Capacities) (42 U.S.C. §1983)

142.  Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

143.  By subjecting Mr. Hudson, Mr. James, and Mr. Adams to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason, and Miller acted with deliberate

indifference to the deceased men's serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

144.  The extreme temperatures Defendants deliberately refused to address and rectify at the Gurney Unit proximately caused the deceased men's untimely deaths.

145.    Accordingly, the individual defendants are liable to the Plaintiffs under 42 U.S.C. § 1983.

### B. AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT, AND REHABILITATION ACT
#### (As to Defendants TDCJ and UTMB Only)

146.  TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

147.  Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act.  42 U.S.C. §12131 *et seq*.

148.  Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperature actually violates the Eight and Fourteenth Amendments of the U.S. Constitution.

149.  The Gurney Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. The three deceased men were otherwise qualified to participate in the programs and services at the Gurney Unit, provided by TDCJ and/or UTMB.

150. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. Hudson, Mr. James, and Mr. Adams were qualified individuals regarded as having a

physiological or mental impairment that substantially limited one or more of their major life activities.

151. Defendants TDCJ and UTMB knew Mr. Hudson, Mr. James, and Mr. Adams suffered from hypertension and/or depression, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that untimely ended their lives.

152. As alleged above, TDCJ and UTMB failed to and refused to reasonably accommodate Mr. Hudson, Mr. James, and Mr. Adams, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused their deaths.

153. As shown above, TDCJ and/or UTMB failed, and refused, to reasonably modify their facilities, services, accommodations, and programs to reasonably accommodate the deceased's disabilities. These failures and refusals caused their deaths.

154. Mr. Hudson, Mr. James, and Mr. Adams died as a direct result of TDCJ's intentional discrimination. The Plaintiffs are entitled to the maximum amount of compensatory and punitive damages allowed by law.

155. Mr. Hudson, Mr. James, and Mr. Adams died as a direct result of TDCJ and UTMB's intentional discrimination. The Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

DAMAGES

156. Mr. Hudson's, Mr. James', and Mr. Adams' survivors are entitled to compensatory and punitive damages against the Defendant individuals in the maximum amounts allowed by law.

157.  Mr. Hudson's, Mr. James', and Mr. Adams' survivors are entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by the ADA, ADAA, and Rehabilitation Act.

158.  As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to, and the wrongful death of Douglas Hudson, Kenneth James, and Rodney Adams, the Plaintiffs assert claims under 42 U.S.C. §1983 , the ADA, ADAAA, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

159.  More particularly, Plaintiff Ashley Adams, as heir at law to the Estate of Rodney Adams, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

154.  Plaintiffs Ashley Adams and Wanda Adams, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Rodney Adams; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

155.  Plaintiffs Carlette Hunter James, Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans, as heirs at law to the Estate of Kenneth Wayne James, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, the Rehabilitation Act, or as allowed by law.

156. Plaintiffs Mary Lou James, Carlette Hunter James, Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Kenneth Wayne James; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

157. Plaintiff Cade Hudson, as heir at law to the Estate of Douglas Hudson, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, the Rehabilitation Act, or as allowed by law.

158. Plaintiff Cade Hudson, in his individual capacity asserts wrongful death claims, having incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Douglas Hudson; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, the Rehabilitation Act, or as allowed by law.

ATTORNEYS' FEES AND COSTS

159.    Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs.  Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ and UTMB for their ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205.

PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.  Award compensatory damages, against Defendants to Plaintiffs;

B.  Award punitive damages against the Defendant individuals, only, under Section 1983 and the Wrongful Death Act, and through the Survival Statute to the Plaintiffs;

C.  Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Dated: June 11, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.   512-623-7727
 Fax.  512-623-7729
By ____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS