UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § | CIVIL ACTION NO. 6:13-cv-712-KNM |
| PLAINTIFFS | § § | JURY DEMANDED |
| | § § | |
| v. BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, L. FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § § § § § § § § | |
| DEFENDANTS | § | |

**PLAINTIFFS' RESPONSE TO NANCY BETTS'
MOTION TO DISMISS UNDER FRCP 12(b)(6)**

### I. SUMMARY OF THE RESPONSE

The Court should deny Defendant Nancy Betts' Motion to Dismiss because Plaintiffs allege – with ample factual support – viable claims under 42 U.S.C. § 1983.

Betts was a licensed vocational nurse working for the University of Texas Medical Branch in the Texas Department of Criminal Justice's Beto Unit infirmary. When Douglas Hudson, plaintiff Cade Hudson's father, suffered a fatal heat stroke, Betts intentionally delayed medical treatment she knew he needed and that she could not provide, causing Hudson's death.

Accordingly, the Court should deny Betts' motion to dismiss.

## II.     FACTS

Licensed vocational nurses cannot, by law, make "medical diagnos[es] or prescri[be] … therapeutic or corrective measures." TEX. OCCUPATIONS CODE Chp. 301.002(5) (defining scope of practice of licensed vocational nurses). By choosing to examine Hudson herself, Betts knew she was merely delaying his access to medical care because she could not actually diagnose or treat his condition without exceeding her legal scope of practice. This intentional decision to delay providing Hudson care, despite obvious symptoms of a debilitating heat stroke, cost Hudson his life.

Though county jails in Texas are required by law to keep indoor air temperatures between 65 and 85 degrees, TDCJ prisons are not air conditioned. *See* 37 TEX. ADMIN. CODE § 259.160. During the summer, the heat index inside the prisons becomes dangerous. The day Hudson died the indoor temperature at the Gurney Unit, where Hudson was imprisoned, felt like 106 degrees. (Plaintiffs' Amended Complaint, ¶ 155). UTMB is the medical provider for most TDCJ prisons, and all UTMB employees are well aware that the extreme indoor temperatures create a serious risk of heat stroke. (*See id.*, ¶ 221).

On the morning of July 24, 2011, a correctional officer noticed Hudson was sick, and sent him to the infirmary. He spent most of the day in the air conditioned infirmary, but was sent back to the extremely hot dorms shortly before the infirmary closed for the day at 6:00 pm. (*Id.*, ¶ 154-157). Just after 6:00 pm, correctional officers found Hudson suffering convulsions and

unresponsive in his bunk at the prison. (*Id.*, ¶ 160). They noted his body was hot to the touch, his face was red and flushed, and he could not speak to the officers. (*Id.*). Because there was no medical staff working at the Gurney Unit after 6:00 pm, pursuant to TDCJ and UTMB policy, the officers called Betts at the nearby Beto Unit. The officers immediately told Betts they believed Hudson's condition was "heat related" because he was "very hot." (*Id.*, ¶ 162).

Despite knowing heat-related injuries require immediate medical attention, and despite being legally incapable of diagnosing or treating Hudson's obviously dire condition, Betts ordered the officers to bring him to the Beto Unit instead of immediately calling 911 so he could go to a hospital where a doctor could diagnose him and prescribe medical care. (*Id.*, ¶ 162). It took officers almost an hour to transport Hudson from the Gurney Unit to the Beto Unit. (*Id.*, ¶ 168). And to take him there, Hudson had to be put into an extremely hot, non-air-conditioned, transport van that had been sitting in the blazing sun all day – taking him from the frying pan of the prison dormitory placing him into the fire of the transport van. (*Id.*, ¶¶ 164-67). Unsurprisingly, when he finally arrived at Beto, Hudson fell out of the transport van, near death. (*Id.*, ¶ 168). By this time, his body temperature was 105. (*Id.*, ¶ 169).

Betts knew bringing Hudson to the Beto Unit would only delay his treatment – even if he arrived immediately at the Beto Unit there was no one there who could treat him and, as an L.V.N., she was incapable of diagnosing or treating him. All she could do was call 911 – the same option available an hour earlier when seconds counted. Due to the delay in treatment, Hudson suffered and died a painful death.

### III.   ARGUMENT AND AUTHORITIES

#### A. Standard of Review

Motions to dismiss for failure to state a claim are "viewed with disfavor and [are] rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). "Under the 12(b)(6) standard,

all well-pleaded facts are viewed in the light most favorable to the plaintiff," though "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (*citing City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010)). "The complaint must provide more than conclusions, but it need not contain detailed factual allegations." *Turner*, 663 F.3d at 775 (internal citations omitted). The complaint only needs to "allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

### B. Plaintiffs Plead Viable § 1983 Claims

Plaintiffs' Amended Complaint states a claim under 42 U.S.C. § 1983 against Betts. Delaying a prisoner's medical care violates the Eighth Amendment if "there has been deliberate indifference that results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (denying summary judgment to nurse who delayed inmate's access to care for four hours). *See also Brown v. Bolin*, 500 Fed. Appx. 309, 315 (5th Cir. 2012) (unpublished) (licensed vocational nurse who delayed prisoner's treatment "undoubtedly acted with deliberate indifference").

The Fifth Circuit's opinion in *Easter* is controlling. In *Easter*, a nurse refused to provide a prisoner prescribed heart medication when he complained of chest pain. After suffering severe chest pain for four hours, the prisoner finally got the prescribed medication he needed when

4

another nurse finally gave it to him. *Id*. at 461. As here, the nurse in *Easter* was subjectively aware of the inmate's serious medical condition – the obvious, substantial risk of harm to Hudson, an inmate living in extreme temperatures who was convulsing, non-responsive, and "very hot," was as palpable as a patient with a heart condition suffering chest pain. *Id*. at 463. *See also Blackmon v. Garza*, 484 Fed.Appx. 866, 873 (5th Cir. 2012) (danger posed by extreme temperatures in TDCJ prisons is obvious). Betts' decision to delay calling 911 demonstrated a "wanton disregard for [a] serious medical need." *Easter*, 467 F.3d at 464.

The cases Betts relies on are unpersuasive. In *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1997), the prisoner received a medical examination, including an x-ray examined by a radiologist, finding an "unsymptomatic" "old ankle injury." The court specifically noted this was not a "serious" medical problem – unlike an emergent heat stroke. Betts relies almost exclusively on cases where *pro se* prisoners received extensive, but unsuccessful, medical care. *See also McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990) ("there is no evidence that [the prisoner] was denied medical attention, an in fact, there appears extensive records documenting assessment and treatment of [his] medical complaints by medical practitioners"); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (the prisoner "was afforded extensive medical care by prison officials, who treated him at least once a month for several years, prescribed medicine, gave him medical supplies, and changed his work status to reflect the seriousness of his problem"). These cases each involve prisoners who were actually examined by medical professionals capable of rendering a diagnosis – unlike Betts who could not legally diagnose any medical condition.

Likewise, *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001), is a classic case of misdiagnosing a prisoner's condition – a psychiatrist failed to

determine a prisoner intended to commit suicide.[1] The prisoner's survivors could not prove the psychiatrist was subjectively aware of the risk of suicide because he (mistakenly) concluded the prisoner was fine after an examination. Unlike here, a medical professional actually capable of diagnosing and treating the prisoner actually examined him and determined he was unlikely to kill himself. While "the decision whether to provide additional treatment is a classic example of a matter of medical judgment," here, Betts legally could not make a medical judgment. *Id.*, at 756.

Betts desire to "personally evaluate Mr. Hudson's medical condition" is irrelevant because the most she could do after assessing him was still call 911. (Betts Motion to Dismiss, Doc. 25, p. 7). Nothing Betts could have seen or discovered would have expedited treatment for Hudson. Diagnosing Hudson or making treatment decisions simply exceeded the scope of her license. But she knew Hudson lived in a dangerously hot environment, and was convulsing, non-responsive, and "very hot," and that heat stroke is a medical emergency. During this emergency, all she could do was call 911. Instead, she decided to examine him personally, which only ultimately delayed life-saving medical care.

## C. Betts is Not Entitled to Qualified Immunity

To defeat qualified immunity, Plaintiffs must show 1) the official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012). As discussed above, Hudson had a clearly established constitutional right to receive emergency medical care without delay.

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then

---

[1] The Circuit specifically noted "suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756.

their conduct in violating that right cannot be objectively reasonable." *Id*. (internal citations omitted).

The Fifth Circuit has previously denied qualified immunity to corrections officials who delayed calling an ambulance after a prisoner suffered a heat stroke. *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) ("their failure to call an ambulance for almost two hours while [the plaintiff] lay unconscious and vomiting rises to the level of deliberate indifference"). Thus, Hudson's right to prompt medical attention was clearly established well before Betts' decision to delay medical treatment. *Austin* is directly on point, providing Betts more than "fair warning" delaying Hudson's medical care violated his constitutional rights. *See id*. ("officers need only have 'fair warning' that their conduct is unlawful") (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). "[A] reasonable person would not have waited nearly two hours to call an ambulance once [the prisoner] became unconscious." *Id*.

## CONCLUSION

For the foregoing reasons, the Court should deny Betts' motion. In the alternative, should the Court feel that the pleadings are deficient in any way, Plaintiffs would respectfully ask for leave to amend, and would request the opportunity to depose Betts to more fully develop the factual record.

DATED: October 11, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
    Tel.   512-623-7727
    Fax.  512-623-7729

By   /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Eastern District of Texas.

By   /s/ Jeff Edwards
JEFF EDWARDS