UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § | CIVIL ACTION NO. 6:13-cv-712-KNM |
| PLAINTIFFS | § § § | JURY DEMANDED |
| v. | § | |
| BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, L. FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § § § § § | |
| DEFENDANTS | § | |

**PLAINTIFFS' RESPONSE TO OWEN MURRAY'S
MOTIONS TO DISMISS UNDER FRCP 12(b)(6)**

## I.   SUMMARY OF THE RESPONSE

The Court should deny Defendant Owen Murray's Motion to Dismiss because Plaintiffs

allege – with ample factual support – viable claims under 42 U.S.C. § 1983.

Douglas Hudson, Kenneth Wayne James, and Rodney Adams are three of at least fourteen Texas prisoners who died of heat stroke between 2007 and 2012. Hudson, James, and Adams were each housed at the Texas Department of Criminal Justice's Gurney Unit and suffered from hypertension and depression —conditions Dr. Murray knew rendered them vulnerable to heat stroke when indoor temperatures soared above 90 degrees. As a policymaker and supervisor for the University of Texas Medical Branch, Murray knew UTMB's policies made no accommodations to protect vulnerable prisoners, like Hudson, James and Adams – and the eleven other men who died – from extreme heat.

Despite knowing prisoners like Hudson, James and Adams were at grave risk in these conditions, Murray failed to implement policies that modified or restricted inmates' housing assignments, and failed to provide prisoners like them any meaningful protection from the extreme heat. Moreover, Murray ended 24-hour medical care at the Gurney Unit, delaying the prisoners' access to care when they suffered the fatal heat strokes.

As a consequence, Hudson, James and Adams endured brutally hot, non-air-conditioned prison dormitories with apparent temperatures[1] exceeding 100 degrees, could not cool their bodies, and died from heat stroke.

By intentionally choosing not to medically restrict these prisoners' housing placement, Murray denied Hudson, James and Adams protection from the elements, violating their rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, and caused their deaths.

Accordingly, the Court should deny Murray's motions to dismiss.

---

[1] Apparent temperature is also called the "heat index" – the combination of heat and humidity that reflects what the body actually "feels." (Amd. Complaint, ¶ 43).

## II.     FACTS

Murray is a high-ranking official supervising UTMB's correctional managed care program which provides health care to prisoners incarcerated in the Texas Department of Criminal Justice's Gurney Unit, where Hudson, James and Adams died. (Amended Complaint, ¶ 20).

Like most TDCJ prisons, the Gurney Unit's dormitories are not air conditioned and brutally hot.  Yet prison authorities make no attempt to cool them. (Amd. Complaint, ¶ 40). Though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, few areas in the state prisons are climate controlled. (Amd. Complaint, ¶ 76). As a result, the apparent temperatures indoors routinely exceed 100 degrees. (Amd. Complaint, ¶¶ 40, 63). Based on internal policies and documents, autopsy reports, and basic medical knowledge, Murray and other high-ranking UTMB officials know these extreme temperatures put prisoners with serious medical conditions like hypertension and depression at risk of injury and death. (*Id*. ¶¶ 63-67, 73).

In fact, beginning in 2007, at least fourteen men died in TDCJ custody from heat-related causes.[2]

| Name | Age | Unit | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | I | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011[3] | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Prescribed diuretic, found at 3:30am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | I | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility, found shortly after midnight |

---

[2] These deaths only include fatalities where the medical examiner determined the cause of death was "hyperthermia" – though hyperthermia is an under-reported cause of death, and heat may be a contributing factor in many other deaths. (*Id.*, ¶ 47).   Thus, it is likely the numbers of deaths caused by the extreme heat inside prison living areas is far higher.

[3] McCollum suffered heat stroke on July 22 and spent six additional days in the hospital before passing.

(*Id*., ¶ 46). Hudson was the fourth man to suffer a fatal heat stroke.[4] James was the eleventh (and second at the Gurney Unit in three weeks). Adams was the thirteenth. Murray knew these men were dying, but made no changes to protect inmates – not even the most vulnerable, like Hudson, James, and Adams.

In this case, Hudson, James and Adams suffered from several serious medical conditions, and met the criteria Murray allegedly helped develop for UTMB and TDCJ that recognize sick prisoners are at risk of heat-related illness or death. Hudson, James, and Adams each suffered from UTMB and TDCJ acknowledged heat-sensitive disabilities:

- Hudson suffered from depression and hypertension. Shortly after he arrived at the prison, he was prescribed beta-blockers and tricyclic antidepressants – drugs that substantially increased his risk of heat stroke. (Amd. Complaint, ¶ 152).

- James suffered from hypertension. When he arrived at the Gurney Unit, he was taking hydrochlorothiazide, a diuretic that put him at greater risk of heat stroke. (Amd. Complaint, ¶ 174).

- Adams suffered from depression, and was taking a selective serotonin and norepinephrine inhibitor (SSRNI) and an anticholinergic to treat his psychiatric condition. (Amd. Complaint, ¶ 199). These drugs increased his risk of heat stroke. Almost a full year after James and Hudson died, no changes had been made to protect Adams.

UTMB policies Murray approved recognize these drugs put patients at increased risk of heat stroke. (*See* Amd. Complaint ¶¶ 143-44, 147). Hudson, James and Adams' serious medical conditions and the medications UTMB prescribed them made their bodies more susceptible to heat stroke. (*See id*., ¶ 45).

UTMB policies Murray implements acknowledge prisoners taking certain medications to treat depression (like beta-blockers, tricyclic antidepressants, diuretics, SSRNIs and anticholinergics) are at increased risk of heat-related illness, and "should not be allowed to work

---

[4] Though Hudson died before Larry McCollum, McCollum collapsed from the high temperatures a few days before Hudson's death, but remained hospitalized in the intensive care unit for a week until he finally passed.

or recreate in environments where the apparent air temperature is 95 [degrees] or higher." (*Id.*, ¶ 62). The UTMB policies, however, provide no protection for prisoners in their housing areas. At temperatures this extreme, Murray knew mere exposure becomes deadly – whether or not a prisoner is also being forced to work.

Even though Murray and other high-ranking UTMB officials indisputably know about these dangers, knew about the pattern of deaths, and their policies even specifically identify the hazard, Murray and UTMB choose not to restrict prisoners' housing in any way, or even recommend TDCJ house prisoners with these heat-sensitive medical conditions in safe environments. (*Id.*, ¶¶ 62-64). Murray and his deputies were even openly dismissive of these serious problems after deaths had occurred. (*Id.*, ¶¶ 126-128). That UTMB's policies only limit convict labor and outdoor recreation when dealing with heat-sensitive medical conditions, even though Murrray knew prisoners with these serious medical conditions can spend up to twenty-three hours a day inside their extremely hot dormitories, epitomizes his indifference. (*See id.*, ¶ 62).

Moreover, UTMB is empowered and obligated to restrict an inmate's housing when his or her serious medical condition requires it. In fact, the UTMB policies Murray approved and implemented require TDCJ to house prisoners who use wheelchairs in wheelchair-accessible facilities. But UTMB has no corresponding policy to ensure prisoners who are at increased risk of heat-related death receive housing accommodations for their serious medical conditions, even though it could easily do so and death from heat stroke is the consequence. (*Id.*, ¶ 64).

Critically, prisoners work and housing assignments are not restricted until they receive an intake physical – which can take up to ten days. (*Id.*, ¶ 85). Though prisoners receive a short, initial medical evaluation when they first arrive (to, among other things, determine what medications they are taking), medical restrictions are not assigned at this triage, and the UTMB

6

forms and policies do not address immediately assigning safe housing to protect prisoners from extreme heat. (*Id*., ¶¶ 85-89). Moreover, the limited medical check the prisoners get does not require UTMB staff to "check to see if a prisoner suffers from a heat-sensitive medical condition." (*Id.*, ¶ 85). No housing or work restrictions are assigned until after the complete intake physical, though these conditions easily could be assigned at triage.

The deceaseds' experience bears this out. Dr. Oliver, for example, continued Hudson's medications after the triage identified he was taking prescription drugs, but Oliver took no step to protect him from the heat even though the drugs put Hudson at increased risk. This is not surprising because the policy Murray authored, approved, and knew to be deficient only prevented Hudson from "working or recreating" in the outdoor sun – not being housed in the blazing hot dorm where he suffered the heat stroke. (*See id.*, ¶¶ 152-53). To receive any special housing assignments, prisoners must wait until the intake physical is completed – which Murray knows can take up to ten days. Each of the deceased perished just a few short days after arriving, before this ten-day window closed.

Though UTMB employees knew Hudson, James, and Adams were at risk, and the policies Murray approved identify people with the same serious medical conditions as those most likely to suffer or die due to exposure to extreme temperatures, Murray's policies failed to place them in safe housing, and provided them no protection from the indoor heat whatsoever. (*Id*., ¶¶ 85-89).

Finally, Murray, in consultation with other high-ranking officials, decided to end around-the-clock medical care at the Gurney Unit. (*Id*. ¶¶ 90-94). The infirmary is one of the few places at the Gurney Unit where prisoners can get out of the heat – indeed, Hudson spent several hours in the infirmary the day he died. (Amd. Complaint, ¶¶ 154-156). But when the infirmary shut down at 6:00 pm, Hudson was thrown back into the blazing hot dormitories, where he collapsed

soon thereafter. (*Id.*, ¶¶ 157-160). When the deceased fell ill, precious time was wasted contacting licensed vocational nurses at the Beto Unit (who, by law, cannot make diagnoses),[5] then futilely transporting the men to this obviously incapable medical staff instead of immediately calling 911. (*Id.*, ¶¶ 160-170 (Hudson's care delayed over an hour); ¶¶ 177-191 (James' care delayed over ten hours)). Each of the deceased suffered delays in medical care that cost them their lives as they awaited transport to another prison or the hospital.

Of course, this was not some hypothetical danger Murray should have been aware of but ignored.  Murray continually disregarded multiple deaths by heat stroke due to high indoor temperatures involving vulnerable prisoners and when Adams died, the conditions in Texas prisons had already killed twelve other men over five years, ten of which died the previous summer. Despite these previous preventable deaths, Murray chose not to make any changes to UTMB's policies or practices. These dangerous conditions were well known and expressly noted in the past, in addition to being obvious hazards. (*See id*., ¶ 134).

As a consequence, Hudson, James and Adams could not cool their bodies and died a painful death from heat stroke. (*Id*., ¶¶ 150-212).

## III.   ARGUMENT AND AUTHORITIES

### A.  Standard of Review

Motions to dismiss for failure to state a claim are "viewed with disfavor and [are] rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). "Under the 12(b)(6) standard, all well-pleaded facts are viewed in the light most favorable to the plaintiff," though "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (*citing City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010)). "The complaint must provide more than

---

[5] *See* Tex. OCCUPATIONS CODE Chp. 301.002(5) (defining scope of practice of licensed vocational nurses).

conclusions, but it need not contain detailed factual allegations." *Turner*, 663 F.3d at 775 (internal citations omitted). The complaint only needs to "allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

## B.  Plaintiffs Plead Viable § 1983 Claims

Plaintiffs' Amended Complaint states a claim under 42 U.S.C. § 1983 against Murray. Murray knew about an obviously dangerous prison condition – the extreme temperatures in the prison – but continually disregarded it as men died, costing Hudson, James and Adams their lives. *See*, *e.g.*, *Blackmon v. Garza*, 484 Fed.Appx. 866, 869 (5th Cir. 2012) (unpublished) (the test for Eighth Amendment liability has an objective element and a subjective element).

### 1.  Murray Knew Extreme Temperatures Were Deadly

Plaintiffs plead Murray knew about the obvious danger of the brutal heat in Texas prisons.  But rather than remedy the dangerous condition, he chose to boast about the blazing heat inside and ignored the dangers.[6]  Even assuming *arguendo* Murray did not have actual knowledge of the previous deaths, and he did in this case, a jury may still infer he was aware of obvious facts. *Blackmon*, 484 Fed.Appx. at 873 (*citing Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004)). In a similar case, the Fifth Circuit recently explained:

---

[6] Amended Complaint, ¶¶ 127 - 129 and 55.

9

> [The warden] testified that she was aware that the summer heat was "intense." Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as [the plaintiff] — an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to [the plaintiff] would further support a jury finding that Defendants were deliberately indifferent to the risks to [the plaintiff's] health.

*Blackmon*, 484 Fed.Appx. at 873. Here, Murray knew indoor air temperatures in TDCJ facilities regularly exceeded 90 degrees, knew the prisons' conditions killed numerous men before, and knew these extreme conditions endangered prisoners like Hudson, James and Adams.[7]

The threat to Hudson, James and Adams could not have been more obvious. System-wide, eleven other people in TDCJ's custody died from heat-related causes in the past five years.[8] Murray knew about these deaths. And these extreme temperatures were not confined to a single prison facility – Plaintiffs allege they exist in prisons Murray was responsible for supervising medical care in around the state. A jury could ultimately infer Murray was aware of the injuries and deaths racked up year after year due to his and UTMB's decision to expose prisoners to this obvious hazard.

Here, James and Adams were the eleventh and thirteenth men respectively, to die from heat stroke since 2007. Hudson was the fourth man.  Yet at no point did Murray do anything to protect these vulnerable prisoners of their brethren.  Accordingly, Murray's failure to make subsequent changes and remedy these glaring, obvious deficiencies and protect prisoners' lives is evidence of his deliberate indifference to the dangerous prison conditions.  In fact, Courts in the Fifth Circuit regularly admit evidence of post-injury conduct by prison officials to determine whether they acted with deliberate indifference. *See*, *e.g.*, *Payne v. Collins*, 986 F.Supp. 1036, 1058 (E.D. Tex. 1997) (overruling objection to relevance of prison investigation "because it was

---

[7] Amended Complaint, ¶¶ 55,63,67.

[8] Amended Complaint, ¶ 46.

instigated by events subsequent to the attacks on [plaintiff]") (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). In *Payne*, the trial court admitted an administrative review conducted by TDCJ that "assessed all aspects of the [prison] after a number of inmates attacked some [officers] and a prisoner was found dead." *Payne*, 986 F.Supp. at 1050. The report was completed months after a prisoner was beaten to death at the prison by other inmates, and discussed other assaults occurring after the death. *See id.*, n. 32. The Fifth Circuit approved admitting this type of evidence to establish liability of correctional facilities at trial. *Shepherd v. Dallas Co.*, 591 F.3d 445, 457 (5th Cir. 2009) (admitting report into evidence showing jail's "specific incidents of failure to provide adequate medical care that occurred shortly before, during, and shortly after the period of [the prisoner's] detention" to show medical care "constitutionally inadequate"). Murray's failure to act to prevent Hudson's, and then James' and then Adams' deaths, not to mention the others, confirms his indifference toward all prisoners at risk of heat stroke, including Hudson, James, and Adams.

## 2. Dr. Murray's Conduct Contributed to the Prisoners' Deaths

### a) *Murray Took No Action to Protect Prisoners' from Extreme Temperatures*

The Amended Complaint alleges Murray, a high-ranking UTMB executive, approved and implemented unconstitutional policies that subjected prisoners with heat-sensitive disabilities (like Hudson, James and Adams), to extreme temperatures in TDCJ's prisons. *See* Plaintiffs' Amd. Complaint, ¶ 54 ("Dr. Murray knows that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from depression and mental illness"); ¶ 55 ("Murray has long known TDCJ does not air condition most inmate living areas and has even given press tours in which he described cells as blazing hot in the summer"); ¶ 63 ("Dr. Murray has not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat").

11

Similarly, the Amended Complaint alleges Murray failed to adequately train prison employees about the dangers of extreme temperatures. (*Id.*, ¶ 97). Instead of training officers to "identify heat-related illness," "large portions of the 2010 [training] circular … discussed preventing heat-related illness in pets" – an obvious defect in the training. (*Id.*).

Murray's personal involvement in Hudson, James and Adams' medical care is not required to establish constitutional liability. The Supreme Court squarely rejected this argument in *Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994):

> If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

Here, Murray is not sued as the prisoners' treating physician, but as UTMB's policymaker who approved procedures that failed to account for the dangers facing prisoners with heat-related illnesses.

The Fifth Circuit recently concluded these facts can establish liability against prison executives in a case where there were no allegations of a serious injury, or previous deaths. *Blackmon*, 484 Fed. Appx. at 873 ("the obvious nature of the risks [of extreme temperatures] to [the prisoner] would further support a jury finding that Defendants were deliberately indifferent to the risks to [the prisoner]'s health").

It is also well settled that when high-ranking officials are involved in unconstitutional decisions they are liable. In *Anderson v. Pasedena Independent School District*, the Fifth Circuit reversed a trial court's decision dismissing executive defendants who unconstitutionally fired a school administrator. 184 F.3d 439, 443-44 (5th Cir. 1999). The Fifth Circuit found a plaintiff can state a claim under 42 U.S.C. § 1983 by "identify[ing] defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the

constitutional violation alleged." *Id*. That is precisely what Plaintiffs' Amended Complaint does – they allege Murray, a high-ranking policymaker, deliberately ignored the needs of sick prisoners especially vulnerable to heat stroke. Murray's deliberate indifference therefore, directly and proximately caused Hudson, James, and Adams' deaths.

Plaintiffs state a claim against policymakers when they allege "specifically enumerated decisions that … [violate] constitutional rights" – such as Murray's decision not to recommend safe housing for prisoners with heat-sensitive medical conditions, and decision to end around-the-clock medical care at the Gurney Unit. *Id*. "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citations omitted). *See also Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (supervisor can be liable for "implement[ing] unconstitutional policies that causally result in the constitutional injury").

Even today, after more than a dozen people have died senseless deaths by heat stroke, Murray has made no changes to UTMB policies or training to protect prisoners' lives.

b) *Murray's Decision to Close the Gurney Unit Infirmary Killed Hudson and James*

Without citing any authority, and ignoring Plaintiffs' allegations altogether, Murray claims the Gurney Unit provided constitutionally sufficient medical care after 6:00 pm because prisoners could be seen by medical staff at "the Beto Unit or hospital." Doc. 24, Murray's Motion to Dismiss, p. 5. But this decision by definition delayed medical care to prisoners suffering medical emergencies. Delaying access to needed medical care violates the Eighth Amendment. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (denying qualified immunity to nurse who delayed treatment of prisoner). When seconds counted, Hudson and James waited

13

hours to receive care because there were no UTMB medical staff at the Gurney Unit after 6:00 pm.

Moreover, Plaintiffs' Amended Complaint explains in detail that UTMB's custom and practice – which was known to Murray – was to first have sick prisoners evaluated at the Beto Unit by licensed vocations nurses before calling 911. This further delayed treatment to prisoners, as licensed vocational nurses by law cannot make "medical diagnos[es] or prescri[be] … therapeutic or corrective measures." TEX. OCCUPATIONS CODE Chp. 301.002(5). After arriving at the Beto Unit, the most the L.V.N.'s could do was call 911 because there were no doctors, physician's assistants, or registered nurses to supervise their practice at the Beto Unit. Calling 911 was the same option available hours earlier at the Gurney Unit.

Here, the injuries Hudson and James suffered from Murray's decision are palpable. Hudson first became sick shortly after 9:00 am, and an officer sent him to the infirmary. He was sent back to the extremely hot dormitory only when the infirmary closed for the day at 6:00 pm. In all likelihood, had the infirmary remained open he would have stayed there. Shortly after returning to the dorm, however, he began convulsing, and was taken back to the now-closed infirmary. Nurses Betts and Fields, over the phone from the Beto Unit, told correctional officers at the Gurney Unit to bring him to Beto – despite his obvious, dire condition, and their legal inability to diagnose him or provide any therapeutic care. This not only critically delayed Hudson's treatment, but also caused officers to put him in an extremely hot transport van when he needed to be kept in a cool environment if he would have any chance at survival. He finally arrived at the Beto Unit almost an hour later – where the nurses then immediately called 911. (Amd. Complaint, ¶¶ 154-169). In a situation where seconds counted, Murray's penny-wise decisions delayed Hudson's treatment for over an hour.

Likewise, had there been medical staff at the Gurney Unit after 6:00 pm, James would have been saved hours of suffering, and would likely be alive today. The Amended Complaint alleges James was not seen at the Gurney Unit infirmary because indifferent nurses and officers decided not to take him to the infirmary when he first became sick shortly before 6:00 pm. (*Id.*, ¶¶ 178-79). After correctional officers ignored James' deteriorating condition for another eight hours, he was finally brought to the idle Gurney Unit infirmary around 2:30 am. There, officers again called the nurses on duty at the Beto Unit – even though this same procedure cost Hudson his life just a few weeks before under near-identical circumstances. Though James' condition was also dire – he had been stumbling around and urinating on himself for hours, and his skin was hot to the touch – there was another 30 minute delay taking him to the Beto Unit before 911 was finally called to take him to the hospital. (Amd. Complaint, ¶¶ 177-192).

Thus, Murray is also sued for damages for his failure to ensure UTMB's policies, practices and procedures protect the lives of prisoners like Hudson, James and Adams and provide access to health care. (Amd. Complaint, ¶¶ 214-217).[9]

### 3.  Murray is Not Entitled to Qualified Immunity

To defeat qualified immunity, Plaintiffs must show 1) the official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012). As discussed above, Hudson, James and Adams had a clearly established constitutional right to be protected from extreme temperatures and receive emergency medical care without delay.

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then

---

[9] Though Murray's name is not included in the title of the "Causes of Action" section due to a clerical error, his name does appear several times in this portion of the complaint. Out of an abundance of caution, Plaintiffs have filed an amended complaint adding Murray's name to the title of the section.

their conduct in violating that right cannot be objectively reasonable." *Id.* (internal citations omitted).

The Eighth Amendment prohibits the prison system from housing inmates in conditions that threaten the substantial risk of serious harm, including temperatures threatening heat stroke. *Blackmon v. Garza*, 484 Fed.Appx., at 869. Federal courts in Texas and the Fifth Circuit have repeatedly found exposure to high temperatures unconstitutional (*id.* 869-70), in opinions published long before Hudson, James and Adams entered the Gurney Unit. *See*, *e.g.*, *Blackmon v. Kukua*, 758 F.Supp.2d 398, 413-14 (S.D. Tex. 2010) (collecting cases showing the right was clearly established). Texas courts have even held people criminally liable for leaving dogs in "hot, very hot" cars. *Lopez v. State*, 720 S.W.2d 201, 202 (Tex. App. – San Antonio 1986). At the time Hudson, James and Adams died, the law was clearly established that prison officials violate the Eighth Amendment by exposing inmates (especially those most vulnerable) to temperatures consistently over 90 degrees. *See*, *e.g.*, *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004).

Murray should be denied qualified immunity because the pleadings clearly demonstrate his liability. Plaintiffs' complaint does not allege he was merely negligent. He actually knew heat in the prisons was extraordinarily dangerous; he knew prisoners were dying of heat stroke; he knew housing prisoners in dangerous heat was unconstitutional; he knew closing the Gurney Unit's infirmary would delay prisoners' access to critical health care; but he still failed to take any action to stop it,  and approved policies and procedures that allowed it.[10]

---

[10] In the event the Court finds the Plaintiffs pleadings deficient, Plaintiffs ask for the opportunity to take Murray's deposition to more fully develop their factual allegations against him.

Hudson, James and Adams, as well as nine other men, died in prisons during the summers of 2011 and 2012 due to extreme conditions Murray was aware of and did nothing about. Thus, Murray is not entitled to qualified immunity.

## CONCLUSION

Because Plaintiffs have plead a claim for relief against Murray, his motion to dismiss should be denied. In the alternative, should the Court find Plaintiff's pleadings deficient in any respect, Plaintiffs respectfully request that they be permitted to take the deposition of Dr. Murray to develop additional facts.

Date: October 11, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
      Tel.    512-623-7727
      Fax.    512-623-7729

By    /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Eastern District of Texas.

By      /s/ Jeff Edwards
JEFF EDWARDS