UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § | CIVIL ACTION NO. 6:13-cv-712-KNM |
| PLAINTIFFS | § § § § | JURY DEMANDED |
| v. | § | |
| BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, L. FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § § § § § | |
| DEFENDANTS | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT McKNIGHT
MOTION TO DISMISS UNDER FRCP 12(b)(6)**

## I.   SUMMARY OF THE RESPONSE

It is well established that a medical provider violates prisoners' constitutional rights when

the provider exhibits deliberate indifference to an inmate's serious medical need.

Here, the decedent, Kenneth Wayne James, suffered a fatal heat stroke. Thus, it is not disputed that his condition was objectively serious and required medical intervention.

Defendant Linda McKnight learned that James was in the throes of a heat stroke, that his vital signs put him close to death, yet she failed to immediately call 911 or get his body cooled. And, though she had no ability to diagnose conditions or prescribe emergency medical care, beyond contacting 911, contends she did not act with deliberate indifference by purposefully delaying James life-saving care.

McKnight's argument is wholly without merit. Plaintiffs have alleged McKnight knew James' body temperature was a dangerously high 108 degrees, and his blood pressure was a precariously low 87/57. Likewise, Plaintiffs allege McKnight knew James was suffering a medical emergency that required treatment she, as a licensed vocational nurse, could not provide. But instead of immediately calling 911 to get James to a hospital – the only place a doctor could examine and treat James –  McKnight purposely delayed James' treatment for over thirty minutes. This is no different than a nurse failing to call 911 as a patient suffers a heart attack, and epitomizes deliberate indifference. *See*, *e.g.*, *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000).

Accordingly, Plaintiffs 42 U.S.C. § 1983 claims against McKnight should not be dismissed.

## II.    FACTS

By instructing officers to bring James to a different prison instead of immediately telling them to get him to a cool place, pack his body in ice, and call 911, McKnight purposely delayed James' access to emergency medical care.

On August 13, 2011, Kenneth Wayne James suffered a fatal heat stroke while he was a prisoner at the Texas Department of Criminal Justice's Gurney Unit.  (Plaintiffs' Amended Complaint, Doc. 8, ¶¶ 192-193.)

At the Gurney Unit, temperatures regularly exceeded 100 degrees at the prison in the weeks before James died. (*Id.*, ¶ 175-76). Though county jails in Texas are required by law to keep indoor air temperatures between 65 and 85 degrees, TDCJ prisons are not air conditioned and no measures are taken to bring down indoor temperatures. *See* 37 TEX. ADMIN. CODE § 259.160; Amd. Complaint, ¶ 40. Thus, James was living in a prison dormitory where the indoor temperature reached 101 the day before he died, and remained over 90 degrees even after 4:00 a.m. the morning of his death. (*Id.*, ¶ 176).

All of the staff working in TDCJ's prisons, including McKnight, are well aware that inmate housing areas are not air conditioned, and the temperatures indoors are brutally hot during the summer. (*Id.*, ¶ 134).

James, a fifty-two year-old man, was also at increased risk of heat stroke because he was obese and took medications to treat hypertension that interfered with his body's ability to counteract the heat. (*Id.*, ¶¶ 141-145, 172).

Beginning shortly after 5:00 p.m. of August 12, 2011, officers recognized James was ill and contacted the nursing staff to bring him to the infirmary. The nurse on duty at the time, Danny Washington, was preparing to leave for the day, and told the officers not to bring James to the infirmary. Instead, Washington told the officers that James should just "drink more water." Though James was suffering symptoms of heat stroke, the officers took no further action. (*Id.*, ¶¶ 177-179).

Throughout the evening and into the early hours of the morning, officers observed James' condition deteriorate. Officers watched James urinate on himself, become disoriented, stumble

back and forth to the restroom to try and drink more water, and complain of being "really hot" and feeling very sick. Finally, at around 2:35 a.m. on the morning of August 13, James could no longer stand up. Finally, officers took him in a wheelchair to the prison's infirmary, which had closed for the night hours earlier. (*Id*. ¶¶ 180-187).

Because the infirmary staff at the Gurney Unit had left for the day, pursuant to TDCJ policy, the officers called McKnight, a licensed vocational nurse, at the nearby Beto Unit. McKnight told the officers to take James' temperature and blood pressure. The officers reported his body temperature was 108, and his blood pressure was 87/57. (*Id*. ¶ 188). Even a layperson, much less a trained medical professional like McKnight, would know a body temperature that high and a blood pressure that low mean a patient needs immediate hospitalization.

Though she knew James' condition was critical, she did not tell the officers to begin basic first aid (like packing James' body with ice and taking him to a cool place, as she was allegedly trained to do), or call 911 to transport James to a hospital where a doctor could evaluate and treat him, as even a layperson would know to do. Rather, she instructed the officers to bring James to her, even though she knew this would simply delay providing James urgently needed medical care. (*Id*., ¶¶ 188-89). In fact, McKnight, as a licensed vocational nurse, knew she legally could not make "medical diagnos[es] or prescri[be] … therapeutic or corrective measures" by herself. TEX. OCCUPATIONS CODE Chp. 301.002(5) (defining scope of practice of licensed vocational nurses). Instead, she told the officers to bring him to the Beto Unit so she could examine him pursuant to TDCJ policy. (*Id*. ¶ 188). Thus, her instructions amounted to a death sentence for James.

Shortly after 3:00 a.m., almost ten hours after officers first knew James was ill, he collapsed as the officers loaded him into the van for transport to the Beto Unit. At that point, the

4

officers called 911 for an ambulance, against McKnight's instructions. (*Id.* ¶ 191). Though James was finally taken to the hospital, he died that morning.

McKnight knew bringing James to the Beto Unit served no medical purpose and would only delay his treatment – there was no doctor or physician's assistant there capable of actually treating him. All McKnight could do to help James was order first aid and call 911 – the same options available thirty minutes earlier. Due to McKnight's purposeful delay in securing medical treatment, and outright indifference to his condition, James suffered and died a painful death by heat stroke.

## III.   ARGUMENT AND AUTHORITIES

### A. Standard of Review

Motions to dismiss for failure to state a claim are "viewed with disfavor and [are] rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). "Under the 12(b)(6) standard, all well-pleaded facts are viewed in the light most favorable to the plaintiff," though "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (*citing City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010)). "The complaint must provide more than conclusions, but it need not contain detailed factual allegations." *Turner*, 663 F.3d at 775 (internal citations omitted). The complaint only needs to "allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before

conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

**B. Defendant McKnight Treated James' Condition with Deliberate Indifference**

It is well settled that delaying a prisoner's medical care violates the Eighth Amendment if "there has been deliberate indifference that results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (denying summary judgment to nurse who delayed inmate's access to care for four hours). *Compare Brown v. Bolin*, 500 Fed. Appx. 309, 315 (5th Cir. 2012) (unpublished) (licensed vocational nurse who delayed prisoner's treatment while he was vomiting blood "undoubtedly acted with deliberate indifference") *with Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (officers who delayed pro se prisoner access to care after minor car accident did not "result[] in substantial harm"). This is exactly what the Plaintiffs plead here – that McKnight knew James was "barely clinging to life," and the delay in treatment proximately caused his death. (*See* Amd. Complaint, ¶ 188, 194).

The Fifth Circuit's opinion in *Easter* is controlling. In *Easter*, a nurse refused to provide a prisoner prescribed heart medication when he complained of chest pain. After suffering severe chest pain for several hours, the prisoner finally got the prescribed medication he needed when another nurse gave it to him. *Id*. at 461. Just like the nurse in *Easter*, here, McKnight was subjectively aware of James' objectively serious medical condition. And just like the nurse in *Easter*, McKnight denied James treatment she knew was urgently needed. McKnight knew about the obvious, substantial risk of harm to James, an inmate living in extreme temperatures who had a body temperature of 108 degrees and a blood pressure of 87/57. James' medical condition, as McKnight well knew, was at least as dire as a patient with a heart condition suffering chest pain. *Id*. at 463. *See also Blackmon v. Garza*, 484 Fed.Appx. 866, 873 (5th Cir. 2012) (danger posed by extreme temperatures in TDCJ prisons is obvious). McKnight's decision to delay calling 911 and

packing James' body with ice demonstrated a "wanton disregard for [a] serious medical need." *Easter*, 467 F.3d at 464.

The cases McKnight relies on are easily distinguishable. For example, in *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1997), the prisoner received a medical examination, including an x-ray examined by a radiologist, finding an "unsymptomatic" "old ankle injury." The court specifically noted this was not a "serious" medical problem – unlike an emergent heat stroke.

McKnight relies exclusively on cases where *pro se* prisoners received extensive, but unsuccessful, medical care, which is not remotely like the situation here. *See also McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990) ("there is no evidence that [the prisoner] was denied medical attention, and in fact, there appears extensive records documenting assessment and treatment of [his] medical complaints by medical practitioners"); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (the prisoner "was afforded extensive medical care by prison officials, who treated him at least once a month for several years, prescribed medicine, gave him medical supplies, and changed his work status to reflect the seriousness of his problem"). Moreover, in each of these cases prisoners were actually examined by medical professionals capable of rendering a diagnosis – unlike McKnight, who could not legally diagnose any medical condition, and purposely chose to delay providing James emergency care.

McKnight's alleged desire to see James is irrelevant because the most she could do after assessing him was still call 911.[3] (McKnight's Motion to Dismiss, Doc. 63, p. 7). Nothing McKnight could have seen or discovered in person would have expedited treatment for James, or

---

[3] McKnight's alleged desire to personally examine James is also beyond the pleadings, and cannot be considered on a motion to dismiss. For the purpose of the motion to dismiss, the Court must accept Plaintiffs' pleadings as true – that McKnight deliberately chose to delay James' access to health care while James was in the midst of a heat stroke. (Plaintiffs' Amended Complaint, ¶ 225).

changed a possible course of action. Diagnosing James or making treatment decisions simply exceeded the scope of McKnight's license. *See Garner v. Winn Correctional Center*, 2011 WL 2011502, *5 (W.D. La. May 18, 2011) ("providing an LPN to perform the diagnostic duties of a physician for inmates is neither negligence nor medical malpractice; it is a failure to provide appropriate medical care to the inmates for which responsible prison officials may be liable to any inmate harmed thereby.") McKnight knew James was living in a dangerously hot environment, had a body temperature of 108 and a blood pressure of 87/57, and otherwise suffering a heat stroke. As heat stroke is a life-threatening medical emergency, not immediately contacting 911 or having his body cooled is deliberate indifference. *See*, *e.g.*, *Brown v. Strain*, 2010 WL 5141215, *8 (E.D. La. Dec. 13, 2010) ("a detainee suffering from an acute medical emergency is constitutionally entitled to prompt medical care"). During this emergency, all McKnight could do was call 911 or have the officers place James in ice while calling 911. She did neither. Instead, she decided to delay securing James life-saving medical care.[4]

Likewise, *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001) supports Plaintiffs' claims, not Defendant McKnight. *Domino* is a classic case of a doctor misdiagnosing a prisoner's condition – a psychiatrist failed to determine a prisoner intended to commit suicide.[5] The prisoner's survivors could not prove the psychiatrist was subjectively aware of the risk of suicide because the psychiatrist (mistakenly) concluded the prisoner was fine after an examination. In other words, a medical professional actually capable of diagnosing and treating the prisoner actually examined him and determined he was unlikely to kill himself.  This

---

[4] Indeed, McKnight knew that, because of the Beto and Gurney Units' remote locations, that waiting for an ambulance to be dispatched and arrive would further delay getting  to a hospital. (*Id.*, ¶ 170).

[5] The Circuit specifically noted "suicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756.

is not remotely like what happened here. The correct analogy would be if McKnight had sent James to the emergency room, but the ER physician incorrectly determined James had a cold.

Instead, McKnight acted like she could diagnose and treat James, even though she knew she absolutely could not.

> If … the medical professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that he also may be liable for deliberate indifference from denying access to medical care.

*Sealock*, 218 F.3d at 1211 (physician's assistant who failed to send heart attack patient to hospital was deliberately indifferent). While "the decision whether to provide additional treatment is a classic example of a matter of medical judgment," here, McKnight legally could not make a medical judgment and delayed James' access to someone who could. *Domino*, 239 F.3d at 756.

### C.  McKnight is Not Entitled to Qualified Immunity

To defeat qualified immunity, Plaintiffs need only show 1) the official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012). As discussed above, James had a clearly established constitutional right not to have his serious medical needs treated with indifference, and to receive emergency medical care without delay.

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Id*. (internal citations omitted).

The Fifth Circuit has previously denied qualified immunity to corrections officials who delayed calling an ambulance after a prisoner suffered a heat stroke. *Austin v. Johnson*, 328 F.3d

204, 210 (5th Cir. 2003) (a failure to call an ambulance for almost two hours while a prisoner is unresponsive "rises to the level of deliberate indifference"). Thus, James' right to prompt medical attention was clearly established well before McKnight's decision to delay medical treatment. *Austin* is directly on point, providing McKnight more than "fair warning" delaying James' medical care violated his constitutional rights. *See id*. ("officers need only have 'fair warning' that their conduct is unlawful") (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). "[A] reasonable person would not have waited nearly two hours to call an ambulance once [the prisoner] became unconscious." *Id*.

McKnight knew the care James needed was unavailable at the Beto Unit, but she chose to bring him there instead of immediately getting him to a hospital. McKnight's choice to bring James to the Beto Unit, despite knowing his vital signs put him near death and he needed an emergency room, is at least the equivalent of a nurse failing to treat a prisoner suffering chest pains. *Easter*, 467 F.3d at 463; *Sealock*, 218 F.3d at 1211. As it is well-settled that a medical provider may not delay treatment for a serious medical condition, which McKnight did by not calling 911 or having James placed in ice despite knowing he had a temperatures of 108 and was suffering a stroke, McKnight is not entitled to qualified immunity.

## **CONCLUSION**

For the foregoing reasons, the Court should deny McKnight's motion. In the alternative, should the Court feel that the pleadings are deficient in any way, Plaintiffs would respectfully ask for leave to amend, and would request the opportunity to depose McKnight to more fully develop the factual record.

DATED: February 24, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
      Tel.    512-623-7727
      Fax.   512-623-7729

By     /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Eastern District of Texas.

By     /s/ Jeff Edwards
JEFF EDWARDS

11