UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § § | |
| | § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and VIRGINIA AVERY as representative of the ESTATE OF MARY LOU JAMES, individually, | § § § § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § | |
| PLAINTIFFS | § § § § § | CIVIL ACTION NO. 6:13-cv-00712-KNM JURY DEMANDED |
| v. | § § § | |
| BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, STEVEN FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, LANNETTE LINTHICUM, JENNIFER BUSKIRK, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § § § § § | |
| DEFENDANTS | § § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs, surviving family members of three men who died in Texas Department of Criminal Justice ("TDCJ") prisons, file this amended complaint pursuant to Federal Rule of Civil Procedure 15 and the Court's scheduling order in this consolidated action to seek redress for their relatives who perished at the brutally hot Gurney Unit.

## STATEMENT OF CLAIMS

1. Prisoners are regularly dying of heat stroke in TDCJ custody at the Gurney Unit in Tennessee Colony, Texas.

2. The survivors of three men who have died, Douglas Hudson, Kenneth Wayne James, and Rodney Adams, bring claims individually, as heirs-at-law and as statutory wrongful death beneficiaries against Defendants for the deaths of their family members.

3. Plaintiffs claim that the Defendant individuals are liable, under 42 U.S.C. §1983, for violating their deceased relatives' constitutional rights under color of law, in violation of the Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment.

4. Plaintiffs further claim that TDCJ and University of Texas Medical Branch ("UTMB") caused their loved-ones' deaths by failing to provide reasonable accommodations for their decedents' disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the ADA Amendments Act ("ADAAA"), 42 U.S.C. §12131 *et seq*., and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights) and §1367 (supplemental jurisdiction).

6. Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(1), as a substantial part of the events giving rise to the claim occurred in this district and division.

PLAINTIFFS

**A.  Rodney Adams' Survivors**

7.   Ashley Adams is Mr. Adams' daughter and sole surviving heir. She sues in her individual capacity and as the sole heir-at-law to Mr. Adams' estate and as a statutory beneficiary under the Texas Wrongful Death Act. Mr. Adams died intestate, and there were no probate proceedings arising from his death, as none were necessary. She is a resident of Parker County, Texas.

8.   Wanda Adams is Mr. Adams' mother, and a statutory beneficiary under the Texas Wrongful Death Act. She resides in Wise County, Texas.

**B.  Kenneth Wayne James' Survivors**

9.   Carlette Hunter James, surviving spouse of Mr. James, sues in her individual capacity and as an heir-at-law of Mr. James' estate, and as a statutory beneficiary under the Texas Wrongful Death Act. At the time of his death, Mr. James had six adult children (and no minor children). He died intestate, and there were no probate proceedings arising from his death, as none were necessary. Ms. Hunter James is a resident of Lubbock County, Texas.

10.   Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans are the surviving adult children of Kenneth Wayne James. They sue in their individual capacities and as heirs-at-law of Mr. James and statutory beneficiaries under the Texas Wrongful Death Act. All, except Arlett James and Jonathan James, reside in Lubbock County, Texas. Arlett James lives in Denton County, Texas; and Jonathan James, in Los Angeles County, California.

11.   Mary Lou James was the mother of Mr. James. Mrs. James died while this suit was pending, and her estate sues as Mrs. James was a statutory beneficiary of the Texas Wrongful Death Act before her death. Virginia Avery is Mrs. James' surviving daughter, and will serve as

the Estate's representative.[1]

### C. Douglas Hudson's Survivors

12. Cade Hudson is Mr. Hudson's son and surviving heir. He sues in his individual capacity and as an heir-at-law to Mr. Hudson's estate and a statutory beneficiary under the Texas Wrongful Death Act. Mr. Hudson died intestate, and there were no probate proceedings arising from his death, as none were necessary. Cade Hudson is a resident of Texas.

DEFENDANTS

**Executive Defendants (Adams, James and Hudson)**

13. Each of these Defendants is a TDCJ executive officer, and they are collectively referred to as the "Executive Defendants."

14. Brad Livingston is the executive director of TDCJ. As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Livingston is a resident of Huntsville, Texas, in Walker County.  He has been served with process and appeared in this litigation.

15. Rick Thaler was the director of TDCJ's Correctional Institutions Division, which manages all aspects of TDCJ's prison facilities. As such, Thaler was the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he was responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all

---

[1] Mrs. James died shortly before this Second Amended Complaint was filed.

relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages.  He has been served with process and appeared in this litigation.

16.   William Stephens was the deputy director of the Correctional Institutions Division. As such, Stephens was the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he was responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

17.   Robert Eason was the regional director for TDCJ's Region II, and supervises eleven prisons, including the Gurney Unit. As regional director, he is responsible for the supervision of all personnel at the Gurney Unit. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason resides in Anderson County, Texas. He has been served with process and appeared in this litigation.

18.   Lannette Linthicum, M.D., is TDCJ's chief medical officer, and supervises and assists in the providing medical care to prisoners at all TDCJ facilities, including the facilities named herein. Linthicum was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Linthicum resides in Walker County. She can be served with process at 2 Financial Plaza, Huntsville, TX 77340.

19.   Kathryn Buskirk, M.D., is the director of quality monitoring and compliance for

TDCJ's Health Services Division. She supervises and assists in providing health care to inmates at all TDCJ facilities. Buskirk was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. Burkirk resides in Walker County. She can be served with process at 2 Financial Plaza, Huntsville, TX 77340.

20.   Defendant Dennis Miller was the warden at the Gurney Unit when deaths occurred, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

21.   Reginald Goings was the warden or assistant warden at the Gurney Unit when deaths occurred, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

22. Dr. Owen Murray is the chief physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the Gurney Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business development, continuing medical education, and staff recruitment and development. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

**Hudson Defendants**

23.   The following Defendants were involved in the death of Douglas Hudson, and are collectively referred to as the "Hudson Defendants."

24.   Defendant Joe Oliver was a medical doctor supervising the infirmary at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

25.   Defendant Nancy Betts was a licensed vocational nurse working in the infirmary at the Beto Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

26.   Defendant Steven Fields was a licensed vocational nurse working in the infirmary at the Beto Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

27.   Defendant John Doe was nurse working in the infirmary at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. He is sued in his individual capacity for punitive and compensatory damages.[2]

**James Defendants**

---

[2] At this time, Plaintiffs are unable to identify John Doe's real name. After Plaintiffs' counsel exercised reasonable diligence, no records showing who examined Mr. Hudson in the infirmary the morning before he died exist, or have been available to Plaintiffs at this time. Plaintiffs will continue to exercise utmost diligence to identify John Doe and amend the complaint accordingly.

28.  The following Defendants were involved in the death of Kenneth Wayne James, and are collectively referred to as the "James Defendants."

29.  Defendant Robert Leonard was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

30.  Defendant Brandon Matthews was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

31.  Defendant Debra Gilmore was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

32.  Defendant Sarah Raines was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

33.  Defendant Matthew Seda was a sergeant at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

34.  Defendant Tully Flowers was a sergeant at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of

TDCJ.  He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

35.  Defendant Doris Edwards was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

36.  Defendant Revoyda Dodd was a correctional officer at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

37.  Defendant Danny Washington was a licensed vocational nurse employed by UTMB at the Gurney Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. He is sued in his individual capacity for punitive and compensatory damages. He has been served with process and appeared in this litigation.

38.  Defendant Linda McKnight was a licensed vocational nurse employed by UTMB at the Beto Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of UTMB. She is sued in her individual capacity for punitive and compensatory damages. She has been served with process and appeared in this litigation.

**Agency Defendants (Adams, James and Hudson)**

39.  The following Defendants are agencies of the State of Texas, and denied Plaintiffs' decedents reasonable accommodations for their heat-sensitive disabilities:

40.  The Texas Department of Criminal Justice is the state prison system, an agency of

the State of Texas. TDCJ's high-ranking policymakers reside in Huntsville. At all relevant times, it operated the Gurney Unit, a public facility with programs and services for which the deceased and other prisoners with disabilities were otherwise qualified. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, and compensatory relief, under federal law. TDCJ has been served with process and appeared in this action.

41.  The University of Texas Medical Branch, located in Galveston, is a component of the University of Texas system. UTMB's high-ranking policymakers, including Dr. Murray, reside and work in Galveston. Through its Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including prisoners at the Gurney Unit. UTMB is a recipient of federal funds, and is sued for declaratory, and compensatory relief under federal law. UTMB has been served and appeared in this litigation.

FACTS

**Extreme Temperatures are Killing Texas Prisoners**

42.  According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." Three of those victims, Douglas Hudson, Kenneth Wayne James, and Rodney Adams, died at TDCJ's brutally hot Gurney Unit.

43.  As every Defendant knows, the Gurney Unit's inmate living areas, like the vast majority of TDCJ prisons, are not air conditioned or climate controlled. As a predictable and known result, apparent indoor temperatures routinely exceed 100 degrees during the hot Texas summers.

44.  The ventilation system at the Gurney Unit, like a most TDCJ prisons, does not lower the indoor temperatures. Rather, the ventilation system just brings in "fresh" hot air from outside,

while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning. The Defendants all know that the ventilation system does not decrease the temperatures indoors.

45.   Upon information and belief, TDCJ has also installed motorized fans in parts of the Gurney housing areas.  Far from lowering the temperature in the housing areas, the fans actually increase the temperature inside and make the housing areas hotter and more dangerous.

46.   Defendants Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

47.   In fact, all of the Defendants know there is little difference between indoor and outdoor summer temperatures at TDCJ prisons, and for extensive periods of the summer months, the temperatures (according to inmates and the basic tenets of thermodynamics) are hotter inside than outside – much the way a garage is often hotter and stuffier than the outside air in the summer.

48.   As each of the Executive Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2011, temperatures this elevated cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

49.   In fact, TDCJ and UTMB incorporated this chart, prepared by the National Oceanic and Atmospheric Administration, into agency policies well before 2011.



50.  The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."

51.  The indoor apparent temperatures at the Gurney Unit routinely reach the orange "danger" and red "extreme danger" zones. According to NOAA, when the apparent temperature reaches the "danger" zone, heat stroke becomes "possible with prolonged exposure." When the apparent temperature reaches the "extreme danger" zone, heat stroke is "imminent." Yet the Executive Defendants have done nothing to cool or even recommend cooling the indoor temperatures to protect inmates from death by heat stroke.

52.  Moreover, the NOAA chart is designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These

charts predict the risk to "healthy" people, not people, like Plaintiffs' decedents, who have an increased risk of heat-related illness or injury due to medical conditions, or prescription medications.

53. It was well known to TDCJ and UTMB leadership, including the Executive Defendants, Linthicum, Buskirk, and Murray, that people with certain medical conditions, like diabetes, obesity or hypertension, or who take certain medications, like psychotropics or diuretics, are much more vulnerable to extreme temperatures. While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people with these medical conditions and disabilities. Their medical conditions prevent their bodies from regulating their temperature, putting them at much greater risk of death.

54. In fact, Thaler had emailed TDCJ and UTMB staff instructing them that prisoners taking certain psychiatric medications were at increased risk of heat-related illness. But despite this knowledge, he took no steps to lower the temperatures in the housing areas. Thaler also discussed this danger with Stevens and Livingston, as well as Murray, Buskirk, and Linthicum. None of them did anything to lower the indoor housing temperatures.

55. Since 1998, at least twenty men have died in TDCJ prisons from heat-related causes:

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|------|-----|--------|---------------|------------|-------------|-------|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diuretics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications, |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togondize | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

56.  In fact, it is likely that there were many more heat related injuries and deaths as hyperthermia is known to be an underreported cause of death by medical examiners and pathologists.

57.  These twenty men all shared certain characteristics. Most took psychotropic drugs to treat some form of mental illness, suffered from diabetes, or took diuretics to treat hypertension. Many arrived in non-air-conditioned TDCJ facilities, like the Gurney Unit, shortly before their deaths – they were not acclimated to the heat, and/or had not received initial physicals. Most collapsed in the middle of the night (when it was hotter inside the housing units than outside), or were found dead early in the morning. And they all died in late July and August – the hottest days of the Texas summer.

58.  Eight of these men, including Mr. Hudson, Mr. James, and Mr. Adams, lived in prisons in TDCJ's Region II – where Eason is the regional director. As the regional director, Eason reviews reports on each prisoner's death, and supervises operations at each of the prisons in his region.

59.  Even though ten men died of heat stroke in 2011 – and eight of them died in his "region" – Eason did not consider these deaths a serious problem. In fact, in the face of these deaths, he believed TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus, he, Miller and Goings took no action to protect future prisoners at the Gurney Unit, like Mr. James and Mr. Adams, in the face of TDCJ's obviously inadequate procedures and dangerous conditions of confinement.

60.  Eason's direct supervisors, Livingston, Thaler and Stephens, were similarly unconcerned. The deaths of prisoners from heat stroke at the Gurney Unit and system-wide were regularly discussed at meetings Thaler and Stephens held with their deputies, including Eason.

Even though the existing policies were proven and obviously inadequate and the conditions were known to be dangerous, Thaler, Stephens, and Eason continued to follow the same deadly course of conduct. Air conditioning the Gurney Unit or other prisons was never even discussed. Moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned or safe prisons was never contemplated or implemented.

61. In 2009, other TDCJ officials asked Livingston, Linthicum and the "executive director's office" "what are we doing about these deaths?" But neither Livingston nor Linthicum took action to upgrade (or even recommend upgrading) TDCJ's facilities to protect inmates from these deadly conditions.  In fact, no one did a single thing to lower the housing temperatures at all.

62. UTMB executives, including Dr. Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and screening materials, even as patients under its care died from hyperthermia. Dr. Murray supervises medical care at TDCJ facilities serviced by UTMB. His job is to provide adequate health care to prisoners, ensure that prisoners have access to adequate health care, that infirmaries at prisons – including the Gurney Unit – are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their disabilities and serious medical needs.

63. Similarly, Dr. Linthicum and Dr. Buskirk are employees of TDCJ's Health Services Division. They supervise the care UTMB provides to prisoners and communicate with the Executive UTMB and TDCJ Defendants. The Health Services Division has, by state law, the authority and obligation to ensure prisoners have access to care, to monitor the quality of care, investigate medical grievances, and conduct operational reviews of health care services at TDCJ

facilities. As such, Dr. Linthicum and Dr. Buskirk also knew that infirmaries were inadequately staffed, that there were no procedures to protect prisoners at risk of heat-related illness, that newly arrived prisoners would wait days before seeing a doctor, and that the temperatures inside TDCJ prisons during the summer were so high and dangerous, inmates' health was placed at great risk.

64.   Despite having these responsibilities, Dr. Murray, on behalf of UTMB, and Dr. Linthicum and Dr. Buskirk, on behalf of TDCJ, have been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.  In fact, Dr. Murray, Dr. Linthicum, and Dr. Buskirk know (according to their own internal policies) that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from hypertension, depression, mental illness, and who are over forty years of age. Likewise, Dr. Murray, Dr. Linthicum and Dr. Buskirk know that prisoners with these medical problems are endangered when placed into brutally hot environments.

65.   Likewise, Dr. Murray, Dr. Linthicum and Dr. Buskirk have long known that TDCJ does not air condition most inmate living areas. Dr. Murray has even given press tours in which he described cells as "blazing hot" in the summer. Moreover, as part of their duties, Dr. Murray, Dr. Linthicum, and Dr. Buskirk have personally examined nearly all of the TDCJ facilities and have visited transfer facilities such as the Gurney Unit.

66.   Dr. Linthicum, Dr. Buskirk, and Dr. Murray routinely receive reports about inmates becoming sick because of the heat each summer. In fact, Dr. Linthicum and Dr. Buskirk have maintained a spreadsheet of all heat-related illnesses inmates suffered since 2010 that shows what medications heat victims were taking, where they suffered from the heat-related illness (such as the housing areas), and what medical conditions the inmates had.

67. Dr. Murray, Dr. Linthcium and Dr. Buskirk are also, of course, well aware of the extremely hot and humid conditions that regularly present themselves each summer in Texas. Dr. Murray, Dr. Linthicum, and Dr. Buskirk were thus aware that in July and August 2011, the Gurney Unit's housing areas were extremely hot and potentially dangerous.

**The Gurney Unit is Especially Deadly**

*The Gurney Unit's Prisoner Housing Areas Are Not Air Conditioned or Cooled*

68. Though extreme indoor temperatures at the Gurney Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Eason, Stephens, Thaler, Livingston, Linthicum, and Buskirk, has taken no steps to air condition or otherwise cool down prisoner housing areas at the Gurney Unit.

69. Each of these officials, and all the Executive Defendants, know the Gurney Unit's windows are sealed shut, and cannot be opened to provide additional ventilation. Thus, the prison housing areas feel like and are equivalent to an oven.  In many ways, the conditions are akin to being locked inside a car with the windows closed in the summer.

70. Moreover, Defendants TDCJ, Livingston, Thaler, Stephens, Eason, Miller, Goings, Linthicum, and Buskirk have chosen not to take such action even though they know many prisoners have medical conditions that make the extreme heat deadly.

71. There are some parts of the Gurney Unit where prisoners could live, at least until they receive the critical intake physical to identify which prisoners suffer from heat-sensitive medical conditions. But TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Goings, Miller, Linthicum, Buskirk, and Murray, do nothing to house prisoners with heat-sensitive conditions in those areas.

72. Additionally, certain areas of the Gurney Unit, like Goings and Miller's offices, are air-conditioned – a comfortable 75 degrees. TDCJ even air-conditions the armory at the prison

because it considers possible damage to its weaponry more important than possible, or even likely, death to the inmate population.

73.  Despite their knowledge of the dangers temperature above 90° Fahrenheit pose to prisoners, TDCJ and UTMB policies only provide protections from heat to inmates performing outdoor forced labor. For example, if a prisoner suffers from heat-sensitive conditions, they cannot "work or recreate in environments where the apparent air temperature is 95° F or higher." TDCJ's policy, however, makes *no* accommodations for prisoners' *housing* assignments even though temperatures in living areas routinely reach the "danger" or "extreme danger" zones in the NOAA chart. TDCJ and UTMB policy only addresses preventing heat-related injuries "in the workplace."

74.  Not surprisingly, Livingston, Thaler, and Stephens have admitted knowing "TDCJ ha[s] no written [policy] to address high temperatures in prisoner housing areas."

75.  Linthicum, Buskirk, Eason and Murray also know TDCJ has no written policy to address high temperatures in prison housing areas.

76.  Similarly, Dr. Murray, Dr. Linthicum, Dr. Buskirk,and UTMB have formulated work policies designed to minimize possible heat exhaustion and heat stroke among inmates performing forced labor. However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the Gurney Unit and other transfer facilities routinely exceed 100 degrees in the summer and that the non-air conditioned housing areas can be hotter than outside temperatures, Dr. Murray, Dr. Linthicum, and Dr. Buskirk have not instituted any practice or policy concerning safely housing inmates known to be vulnerable to the heat.

77. UTMB, operating under a policy developed by TDCJ, makes housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair,

for example, could not be assigned to a top bunk. But UTMB and TDCJ policies intentionally do not contemplate special housing for prisoners with heat-sensitive disabilities.  Rather, they intentionally deny this reasonable accommodation to prisoners with heat-sensitive disabilities.

78.  Likewise, the Executive Defendants know UTMB does not recommend special housing for prisoners with heat-sensitive medical conditions.

79.  The Executive Defendants also chose not to provide prisoners at the Gurney Unit, including Mr. Hudson, Mr. James, and Mr. Adams, opportunities to cool off in an air-conditioned environment. Though some parts of the Gurney Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners were not given a chance to cool off.

80.  As a consequence, inmates with hypertension and depression, as well as inmates prescribed psychotropic drugs or diuretics, as well as obese or older people at risk, are regularly housed in extreme temperatures and in danger of suffering heat stroke.

81.  Even though at least twenty inmates have died from heat stroke since 1998 due to extreme indoor temperatures – including at least three at the Gurney Unit – Murray, Linthicum, Buskirk, and UTMB have done nothing to protect the weakest inmates TDCJ houses from high indoor temperatures.

82.  And, while Livingston, Thaler, Stephens and Eason know the housing areas expose such vulnerable prisoners to the extreme heat, and know vulnerable prisoners remain in danger, they did nothing to lower the temperatures to a safe level or get the vulnerable prisoners safe housing.

83.  Moreover, Eason has testified under penalty of perjury that he considers adding any air conditioning to TDCJ's prisons a "waste of money," even though eight men died in his region.

84.  As further proof of his indifference, Eason made this statement without any knowledge of the cost – as none of the TDCJ Executive Defendants had even bothered to study the costs associated with cooling down certain housing areas.

85.  Nor does it appear that the TDCJ Defendants care about the officers working under their supervision either as they know correctional officers who work in the inmate housing areas are exposed to the same dangerous temperatures and also routinely suffer heat-related injuries.

86.  In fact, officers regularly sweat through their uniforms, and have to towel sweat off their faces when leaving the inmate dormitories. And the Executive Defendants all know officers routinely suffer and fall ill because of the heat.

87.  The situation is so dire that the correctional officer's union has found common cause with the prisoners, and publicly supported the extreme temperature lawsuits brought against TDCJ.

88.  The correctional officer's union has made numerous public requests for the prison housing areas to be air conditioned, but TDCJ, Livingston, Thaler, Stephens, and Eason have ignored or disregarded these requests for safe working conditions.

89.  But while the Executives, including Livingston, know about and ignore the hazards to prisoners and correctional officers, TDCJ officials, including Livingston, approved installing climate controlled hog barns to protect the welfare of TDCJ's pigs raised for slaughter.

90.  TDCJ has detailed policies, which Livingston approved, that require TDCJ to house pigs in safer and more humane temperatures than prisoners.  More specifically, TDCJ policy, that was approved by Livingston, requires the pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials."

91.  Misters are to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable."

92.  And TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort."

93.  TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs "health," and "some form of cooling" is required above this "critical limit."

94.  High-ranking TDCJ officials, including Livingston's deputy, presumably with the full knowledge of Livingston, even told the press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke.

95.  Tellingly, TDCJ has no similar policy to protect humans in its custody.

*People with Medical Conditions That Decedents Suffered From Are Especially Vulnerable to Extreme Temperatures*

96.  TDCJ and UTMB's policies and procedures recognize heat stroke is a "medical emergency" where delay can be fatal.

97.  TDCJ and UTMB policies specifically acknowledge certain medical conditions like cardiovascular disease and psychiatric conditions affect heat tolerance.

98.  TDCJ also advises its employees that an increased risk of heat stroke occurs when people are "over the age of 40," "are in poor physical condition or overweight," or "use certain medications," including diuretics and psychotropics. Though many TDCJ prisoners are young and healthy enough to survive and merely suffer in these inhumane conditions, Defendants know that prisoners with these identified medical conditions are the weakest of the weak and at heightened risk of death from heat.

99.  TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Goings,

Miller, Linthicum, Buskirk and Murray know prisoners in TDCJ custody are afflicted with these disabilities, suffer in TDCJ's prisons because of the extreme temperatures every summer, and are at increased risk of heat-related injury.

> *Though the Gurney Unit Is A Transfer Facility, TDCJ Does Not Acclimate Prisoners To The Extreme Temperatures They Must Endure*

100. The Gurney Unit, as all defendants know, is a transfer facility, where people are processed into the prison system. Like the decedents, Mr. Adams, Mr. James, and Mr. Hudson, most TDCJ prisoners arrive at transfer facilities from air-conditioned county jails – a fact all defendants also knew.

101. People whose bodies are not acclimated to the heat are at much greater risk of death. In fact, TDCJ and UTMB policies recognize the importance of "acclimatizing staff and [prisoners]" to prevent heat stroke. But when the body is exposed to extreme temperatures without acclimation, the risk of injury or death markedly increases.  And the agency defendants and their leadership, including the named defendants in this suit knew this as well.

102. In contrast to TDCJ facilities, Texas county jails are required by law to keep indoor temperatures between 65 and 85 degrees. *See* 37 Tex. Admin. Code §259.160. Thus, when prisoners arrive from temperature-controlled jails at the brutally hot Gurney Unit, the Defendants know they are at heightened risk of heat-related injury or death.

103. Many of the prisoners who have died of heat stroke actually spend only a few days in TDCJ custody. The two prisoners who died in 2007, for example, spent less than a week at the Byrd Unit before the heat killed them.

104. Mr. Hudson was at the Gurney Unit just four days before he died.

105. Mr. James died less than three days after arriving at the Gurney Unit.

106. Mr. Adams died after a little more than twenty-four hours at the Gurney Unit.

*Gurney Unit Prisoners Cannot Access Fans, Cups, and Shorts*

107. Not only is it brutally hot and difficult to acclimate at the Gurney Unit, but inmates at transfer facilities also cannot immediately access the prison commissary pursuant to TDCJ policy. Livingston, Thaler, Stephens, Eason, Miller and Goings know of and implemented this policy. Thus prisoners cannot even purchase items to help combat the heat – like fans, light-weight clothing and shorts, and even cups to drink water from.

108. Moreover, Defendants do not even permit personal fans at the Gurney Unit.

109. And not only were Mr. James and Mr. Hudson deprived of cups at the Gurney Unit, Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures indoors. TDCJ policy requires officers only to bring one large jug per fifty-four prisoners to the prisoner living areas (at most) three times a day and often less than that. Throughout the system, and at Gurney, the jugs did not contain enough water for each prisoner to drink sufficient amounts to protect them from the heat. The jugs are also frequently filled with lukewarm water. Officers under Miller and Goings supervision, and with their approval, did not provide enough water to for prisoners to stay hydrated during the summer at the Gurney Unit. There was not even a verification procedure in place to document that water was being supplied.

110. Thus, even the grossly inadequate measures TDCJ purports to rely on to help prisoners cope with heat were unavailable, and known to be unavailable by the defendants, at the Gurney Unit.

*TDCJ and UTMB Fail to Timely Identify Heat-Sensitive Medical Conditions*

111. Just as importantly, it can take up to ten days for prisoners to receive an intake physical when they come into TDCJ custody, pursuant to policies drafted and/or implemented by TDCJ and UTMB.

112. When inmates arrive in custody, an initial medical triage is performed where a licensed vocational nurse with little training asks inmates if they suffer from certain medical problems, including heat-related medical conditions. But, though inmates' medical problems (including many heat-sensitive conditions) are identified and known at triage, TDCJ and UTMB do nothing at this time to ensure that inmates with heat-sensitive disabilities receive safe housing or other accommodations for their heat-related disabilities.

113. Rather, pursuant to TDCJ and UTMB policy, prisoners using wheelchairs or in obvious need of a bottom bunk are the only inmates who receive any accommodation for their disabilities after the triage evaluation.

114. Other accommodations for disabilities – such as the prohibition on forced outdoor labor for heat-sensitive people – are not provided until the intake physical.

115. The intake physical is critical, because it is the first opportunity for UTMB and TDCJ to accommodate prisoners' heat-sensitive medical problems. At the Gurney Unit, and throughout TDCJ facilities it serves, Dr. Murray, Dr. Linthicum, and Dr. Buskirk know UTMB fails to even immediately check to see if a prisoner suffers from a heat-sensitive medical condition.

116. Likewise, Livingston, Thaler, Stephens, and Eason know that prisoners do not receive intake physicals until after they have been incarcerated for several days.

117. As a consequence of this policy, UTMB and TDCJ routinely fail to make sure prisoners receive these essential physical examinations promptly, even during the extremely hot summer months. This loophole leaves inmates with heat-sensitive conditions and disabilities, such as decedents, in danger.

118. And despite knowing that prisoners like decedents were in grave danger, TDCJ fails to house newly-arrived prisoners, who are awaiting a UTMB intake physical, in the air-

conditioned parts of the prison or rotate prisoners who have not had their physicals through the air-conditioned areas to provide some respite, even though UTMB and TDCJ identify prisoners with heat-sensitive conditions at triage.

119. To put it simply, TDCJ officials, like Eason, Thaler, Stephens, Miller, Goings, Murray, Linthicum, Buskirk, and Livingston, know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners, yet they did nothing to correct it.

*The Gurney Unit Does Not Have Medical Staff at Night*

120. Moreover, Livingston, Dr. Murray, Dr. Linthicum, Dr. Buskirk, TDCJ, and UTMB *choose* not to employ any medical staff at the Gurney Unit between 7:00 p.m. and 9:00 a.m., even though over 2,100 men are housed there every night and significant numbers (well over 15%) suffer from hypertension, take medications for serious mental illnesses, or are otherwise at greater risk from the extreme heat – especially when first acclimating to such harsh temperatures.

121. Instead, prisoners needing after-hours medical care are evaluated over the phone by licensed vocational nurses working at the nearby Beto Unit who are unable to even take vital signs – including, critically, body temperature, blood pressure, and pulse rate. It is TDCJ and UTMB's practice (known to the Executive Defendants) to require these nurses to evaluate a prisoner in person before calling 911, even if transporting the prisoner from the Gurney Unit to the Beto Unit significantly delays treatment for prisoners with disabilities or experiencing a medical emergency.

122. Of course, by law, licensed vocational nurses cannot make diagnoses and must practice under the supervision of a doctor or registered nurse. After hours, there are not even registered nurses working at the Beto Unit, leaving the licensed vocational nurses alone to make critical medical decisions. Thus, Livingston, Dr. Linthicum, Dr. Buskirk, Dr. Murray, TDCJ and

UTMB do not provide direct, immediate access in person or even via telemedicine to doctors or competent medical providers capable of providing treatment recommendations from 7:00 p.m. to 9:00 a.m.

123. The Executive Defendants, Dr. Linthicum, Dr. Murray, TDCJ, and UTMB made this decision for financial reasons, despite knowing it placed inmates at risk during the evening and the middle of the night, and at grave risk in emergency situations where medical care was immediately needed.

124. Failing to provide around-the-clock medical staff is especially dangerous at prisons like the Gurney Unit, which are located in remote, rural areas of the state. It can take an ambulance from Palestine over an hour to make a round trip run to the Gurney Unit, delaying critical medical care for prisoners suffering from a heat-related emergency.

125. The TDCJ and UTMB employees at the Gurney Unit, including Miller, Goings, Leonard, Matthews, Gilmore, Washington, Seda, Flowers, Edwards, McKnight and Dodd, knew there was no medical staff at the facility after 7:00 p.m., that for a prisoner to receive immediate medical attention they would have to be transported to a hospital by ambulance, and that it could take up to an hour for an ambulance to make a round-trip journey out to the Gurney Unit and back.

*Correctional Officers at the Gurney Unit are Inadequately Trained*

126.  Because the apparent temperatures are so high, it is imperative TDCJ's low-level employees recognize heat-related illnesses and provide prisoners with emergency medical care when needed. The training TDCJ provides the officers responsible for day-to-day supervision of prisoners, however, is grossly inadequate. A memo devoid of solutions or real instruction is merely read aloud to officers by mid-level supervisors, like a sergeant. The same training materials are recycled every year, and were not even updated or emphasized after Mr. Shriver

and Mr. Robles died in 2007 - or, shamefully, after the ten prisoners died in 2011 from heat stroke.

127.  UTMB and TDCJ medical staff are not involved in teaching line officers to identify heat-related illness – even though, when a prisoner needs medical care, the low-level officers are the gatekeepers standing between him and a doctor. Instead, much of the recycled training circulars focus on employees staying hydrated. Large portions of the 2010 circular even discussed preventing heat-related illness in pets.

128.  As the wardens and regional director, respectively, Miller, Goings and Eason are directly responsible for training the front-line officers charged with protecting prisoners' lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ correctional officers receive adequate training, and supervise the development and implementation of the training materials. Each failed to provide meaningful training, and many people died as a consequence.

*When Men Died in 2007, TDCJ and UTMB Failed and Refused to Make Changes*

129. Two of TDCJ and UTMB's victims died at another TDCJ transfer facility in 2007 – the Byrd Unit. James Shriver was at the Byrd Unit less than 24 hours before he died. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007, from an air-conditioned TDCJ inpatient mental-health facility. Shortly before 5:00 am the next day, officers found him dead in his cell.

130. Less than a week later, a second man died of heat stroke at the Byrd Unit. Dionicio Robles also came to the Byrd Unit from an air-conditioned TDCJ inpatient mental-health facility. He arrived at the Byrd Unit on August 3, 2007. He was dead less than ten days later. He was also found dead in his cell shortly before 5:00 am.

131. Though Mr. Shriver and Mr. Robles were known to suffer from heat-sensitive medical conditions, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

132. Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including the Executive Defendants – all of whom knew about the deaths. But even though two men died under extremely similar circumstances, TDCJ and UTMB made no changes to operations to protect the lives of vulnerable prisoners in the future. Rather, they continued to purposefully expose individuals in their care to temperatures they knew endangered human life.

133. In fact, in 2009, Dr. Linthicum received an email from the "executive director's office" asking "if the agency has taken measure[s] to prevent further heat related deaths following these incidents?" Linthicum responded that "CID" – Thaler and Stephens' division – "had developed a working paper a few years back" that outlined how TDCJ responds to extreme temperatures. This "working paper," in reality, made no changes and despite the executives' knowledge of these deaths they continued to run the agency as if it were business as usual.

134. Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

*As Men Died in 2011, TDCJ and UTMB Still Failed and Refused to Make Changes*

135. The first TDCJ prisoner confirmed to die from heat stroke in 2011 was Larry Eugene McCollum. He was found unresponsive in his bunk at the Hutchins Unit – another TDCJ transfer facility Eason supervise that exposes prisoners to brutally hot temperatures well above 100 degrees – on July 22, 2011. He was hospitalized until life-support was withdrawn on July 28, 2011.

136. Mr. McCollum had not received an intake physical from UTMB, and had been unable to acclimate his body to the increased heat.  In prison for forging a check, he effectively received a death sentence from TDCJ.

137. Douglas Hudson suffered a heat stroke on July 24, 2011 at the Gurney Unit. When he received medical attention at the prison his body temperature was 105 degrees. He was eventually taken by ambulance to Palestine Regional Medical Center, but died on July 25, 2011.

138. A few days later, an email was sent to Gurney Unit employees, including Miller, Goings, Leonard, Matthews, Gilmore, Washington, Seda, Flowers, Edwards and Dodd, informing them "it is imperative that we take an aggressive proactive approach to the heat related issues we are currently facing due to the extreme temperatures." Despite this recognition of the life-threatening situation at the prison, Livingston, Thaler, Stephens, Eason, Miller and Goings failed and refused to make any changes to protect prisoners' lives at Gurney. No cooling measures were instituted despite the obvious and known risk to prisoners.

139. Later that day, Thomas Meyers, 46, died at the nearby Coffield Unit from heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention. Eason supervises the Coffield Unit but he and the other Executive Defendants did nothing to ensure more prisoners did not die.

140. The next day, Robert Webb, 50, died at the Hodge Unit from heat stroke. Mr. Webb suffered from developmental disabilities and depression, and was prescribed medication that made him very susceptible to heat stroke. Eason supervises the Hodge Unit.

141. Later that week, Alexander Togonidze, 44, died of a heat stroke at the nearby Michael Unit – yet another prison Eason supervises. Mr. Togonidze had even been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

142. That same day, Charles Cook, 53, collapsed and died from a heat stroke at the Hodge Unit, and Michael Martone, 57, died at the Huntsville Unit from heat stroke.

143. A few days later, Kelly Marcus, 36, died from heat stroke at the Connally Unit.

144. And in the face of this epidemic of heat related deaths, the Executive Defendants still did nothing to cool the housing areas and did not implement any new protective measures for the prisoners.

145. Then, on August 13, 2011, Mr. James died at the Gurney Unit.

146. Once again, as after prior deaths, Livingston, Thaler, Stephens, Eason, Goings, and Miller failed and refused to make changes necessary to prevent heat deaths.

147. Despite these ten confirmed heat stroke deaths in 2011 – all of which were related to the extreme heat inside the housing areas – Dr. Murray, Dr. Linthicum, Dr. Buskirk, TDCJ and UTMB did not change their policies or procedures.  Rather, they continued to house vulnerable inmates in extremely hot temperatures without any cooling protections and continued to ignore the need to protect vulnerable prisoners who could not or who had difficulty acclimating from the air-conditioned county jails from which they came to the brutally hot prions run by TDCJ.

148. As a consequence of this indifference, iapproximately one year later, Mr. Adams died at the Gurney Unit from heat stroke.

149. And a few weeks later, a heat stroke killed Albert Hinojosa, another prisoner, at the TDCJ Garza West Unit.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions**

150. Livingston, Thaler, Stephens, Eason, Miller, Goings, Murray, Linthicum, Buskirk, TDCJ, and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed and refused to take reasonable steps to protect the health and safety of prisoners.

151. And Livingston, Thaler, Stephens, Eason, Goings, Miller, Linthicum, Buskirk, and Murray all knew inmate living areas at the Gurney Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers, and regularly exceeded 90 and 100 degrees indoors.

152. Livingston, Thaler, Stephens, Eason, Miller, Goings, Linthicum, Buskirk, and Murray knew that extreme temperatures can be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with hypertension and depression in extremely hot facilities like the Gurney Unit. TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, Goings, Miller, Linthicum, Buskirk, and Murray implemented (and could have changed), make no accommodation for people with hypertension or depression during periods of extreme temperatures.

153. Though Livingston, Thaler, Linthicum, Buskirk, Murray, and Stephens work in Huntsville, as long-time Texans they are very familiar with the high-temperatures the state experiences during the summer months. Eason, Goings and Miller worked at the Gurney Unit, or in nearby Tennessee Colony, every day, and knew about the extreme temperatures the area experiences each summer.  Upon information and belief, all of the defendants had been inside the Gurney Unit during the summer and knew it to be extremely hot.

154. Miller, Goings, Leonard, Matthews, Gilmore, Washington, Seda, Flowers, Edwards, and Dodd all work at the Gurney Unit, and are well aware how hot the indoor temperatures can be. McKnight works at the nearby Beto Unit, which also does not air condition prisoner housing areas, making her equally aware of the danger the heat poses.

155. Additionally, Eason, Miller, Goings, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months.

156. High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes at least as far back as 1998. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

157. In addition, Livingston was a named defendant in *Blackmon v. Kukua*. In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned." Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit, another TDCJ transfer facility. Livingston knew of this allegation but still made no changes at Garza East or any other TDCJ unit to remedy the danger. *Blackmon* went to trial in February 2011, just a few months before men began dying at the Gurney Unit, and throughout the TDCJ system.

158. High-ranking UTMB officials were dismissive of the *Blackmon* suit. Dr. Charles Adams, a chief UTMB physician and Murray's deputy, falsely denied any problem existed despite knowing as a doctor that extreme heat endangers many prisoner.  He flippantly testified at trial "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away."

159. Tellingly, Dr. Adams acknowledged in emails later that year that the prisoners needed "cooling" and that the prisoner population was vulnerable to the heat and needed to be protected.  But, he, Murray and UTMB made no changes. Rather, in the face of people dying from heat stroke at alarming levels during the summer of 2011—they continued to ignore the problem and kept prisoners in grave danger.

160. Murray was also aware of the *Blackmon* allegations and the danger extreme heat posed to prisoners.  But he implemented no changes.

161. As a result, UTMB providers at all prisons, including the Gurney Unit, continued to fail to accommodate inmates vulnerable to the heat during the summer months by providing intake physicals sooner or by recommending any housing restrictions.

162. UTMB has also testified TDCJ does not provide enough beds system-wide to accommodate even the prisoners with serious medical conditions who are at greater risk of heat-related illness, injury or death.

163. TDCJ and, UTMB use a Utilization Review Committee to determine which inmates are assigned the small number of climate-controlled beds.

164. Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness for TDCJ, testified as follows:

Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?

A: Pretty much. That's a fair description.

Q: Do you know how many of those triage beds or cells you're talking about?

A: How many are there?

Q: Yeah.

A: Absolutely … there were 471 [in 2011]. We now have 481.[4]

Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

A: No, but it's all we have.

Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

A: Essentially, yes.

---

[4] Though UTMB manages 481 beds, there are some additional beds available with TDCJ's other medical provider, the Texas Tech University Health Science Center.

165.    In other words, TDCJ, UTMB, Livingston, Thaler, Stephens, Linthicum, Buskirk, Eason, Goings, and Miller knew the system did not have enough air-conditioned beds to safely house prisoners at increased risk of heat-related illness, injury or death. The Agency Defendants and Executive Defendants know the lack of air-conditioned beds will guarantee inmates with heat-sensitive medical conditions and disabilities are exposed to dangerous conditions, that some will become sick, and some will die.

166.    TDCJ intentionally does not provide any additional air-conditioned beds. There are only 551 air-conditioned beds system-wide, severely limiting number of prisoners with heat-related disabilities who can be accommodated.

167. In fact, though fourteen people have died from heat stroke in TDCJ units in which UTMB provides health care since 2007, Murray and UTMB continue to turn a blind eye and expose the most vulnerable prisoners to the dangers of extreme heat.

168. In 2011, the day before Mr. James died (and a year before Mr. Adams died), State Representative Sylvester Turner, the former chair of the Texas Criminal Justice Subcommittee, wrote a letter to Livingston expressing his concern about the high temperatures in TDCJ prisons, that "temperatures inside cells have reached as high as 120 degrees during the day and do not fall below 100 degrees at night." He asked TDCJ to take "any and all preventative measures … to ensure that inmates and guards inside TDCJ do not suffer."

169. Livingston instructed his surrogates, including Thaler, to write back to Rep. Turner, but failed and refused to make any changes to TDCJ's operations. Their response to a state legislator was just to repeat the same steps TDCJ knew failed to prevent prisoners' deaths and knew did not reduce the temperatures in the housing areas at all.

170. Livingston was also sued in *McCollum v. Livingston*, a wrongful death case that was filed a few weeks before Mr. Adams' death. Mr. McCollum died after suffering a heat stroke at TDCJ's Hutchins Unit – another Region II transfer facility.  Texas and national media outlets covered this story before Mr. Adams died.

171. Likewise, in summer 2012, before Mr. Adams died, there was intense media coverage of the extreme temperatures in Texas prisons. The *New York Times*, *Houston Chronicle*, and *Fort Worth Star Telegram* all editorialized TDCJ should not expose prisoners to these extreme conditions.

172. The Executive defendnats, upon information and belief, were aware of this news coverage.

173. But Defendants did nothing to cool down the Gurney Unit and left inmates, including Mr. Adams, in danger.

174. As the conditions at the Gurney Unit are long-standing, well-documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like the three decedents here, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed, and continue to pose, a life-threatening health risk.

175. Yet, rather than seek to have the housing areas cooled by air conditioning, use a cooling alternative, make accommodations for inmates to cool down, or make sure inmates with serious medical conditions such as diabetes, COPD, hypertension, depression, or who were prescribed certain medications, were housed in air conditioned units, these officials chose to continue to subject inmates to dangerous, extreme heat.

176. TDCJ's Emergency Action Center generates reports that track heat-related injuries and deaths system-wide. High-ranking officials like Thaler, Stephens, Eason, Goings and Miller routinely review the EAC reports generated at the facilities they supervise. These reports would

have shown them prisoners and staff were suffering heat-related injuries every summer at the prison. These Defendants reviewed the EAC reports for all of the heat related deaths described herein.

177. Likewise, Murray, Buskirk, and Linthicum regularly reviewed reports of inmates' heat-related injuries, and knew inmates routinely suffered from heat-related medical conditions.

178. UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Goings, Miller, Linthicum, Buskirk, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Gurney Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Eason, Goings, and Miller were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

179. Despite the epidemic of heat-related deaths, the Executive Defendants refused and still refuse to act, authorize or otherwise approve actions to address these conditions.

180. At the time of the deaths of Mr. Hudson, Mr. James, and Mr. Adams, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Thaler, Stephens, Eason, Goings, Miller, Linthicum, Buskirk, and Murray are not entitled to qualified immunity.

181. The conditions at the Gurney Unit result in gratuitous pain and suffering for all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Mr. Hudson, Mr. James, and Mr. Adams, as well as to prisoners who are incarcerated there today. These conditions have no legitimate penological purpose.

**Plaintiffs' Decedents Had Disabilities**

*Hypertension*

182. Hypertension is a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood

flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

183. As Defendants well know, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

184. Diuretic medications are frequently used to treat hypertension. Diuretics remove water from the blood to decrease blood pressure. Diuretics thus increase a patient's risk of heat stroke, because they cause dehydration and electrolyte imbalance. UTMB and TDCJ policies recognize diuretics increase a patient's risk of heat stroke.

185. Beta blockers are also used to treat hypertension. These drugs reduce the body's ability to sweat, which is necessary to dissipate heat. An inability to perspire normally substantially increases a person's risk for heat-related illnesses and death.

186. As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limits the operation of one's respiratory, circulatory, and cardiovascular systems. Critically, hypertension substantially limits patients' ability to thermoregulate – the ability of the body to maintain a safe temperature.

*Depression*

187. Depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, thoughts of suicide, and problems concentrating. Depression is a physiological condition affecting body systems, including the

brain.

188. Depression can prevent a patient from being able to self-regulate their body's temperature during periods of extreme heat, such as by preventing patients from realizing they need to drink additional water.

189. Depression substantially limits one's ability to think, concentrate, and sleep, and limits the operation of the brain. Depression also substantially limits one's ability to thermoregulate.

190. UTMB policy recognizes patients taking medications like Cogentin, antihistamines (like Visatril), and beta-blockers (like Lopressor), are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher," because the medications impair the body's ability to thermoregulate.

191. TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason and Miller, know that many prisoners with hypertension and depression live in Texas prisons.

192. Here, TDCJ and UTMB discriminated against Mr. Hudson, Mr. James, and Mr. Adams, by denying them reasonable accommodations necessary to allow them access to TDCJ and UTMB's programs and services, including safe housing at the prisons. The extreme heat in TDCJ facilities denies people like Mr. Hudson, Mr. James, and Mr. Adams access to TDCJ facilities.

**Douglas Hudson's Death**

193. In the 38 days before Mr. Hudson's death, the temperature at the Gurney Unit exceeded 100 degrees Fahrenheit on 30 days.

194. Mr. Hudson arrived at the prison on July 20, 2011. He was serving a short prison sentence for driving while intoxicated. The temperature that day reached 101 degrees.

195.  Mr. Hudson suffered from depression and hypertension. Dr. Joe Oliver prescribed him Elavil (amitriptyline), a tricyclic antidepressant, and Lopressor (metoprolol), a beta-blocker, to treat his disabilities. Dr. Oliver knew UTMB policy recognizes prisoners taking Lopressor are at heightened risk of heat stroke. Likewise, Dr. Oliver also had actual knowledge patients taking tricyclic antidepressants are at greater risk of heat stroke.

196.  Despite knowing the prison became extremely hot during the summer, and knowing the drugs he prescribed put Mr. Hudson at much greater risk of heat stroke, Dr. Oliver prescribed the drugs anyway.

197.  On July 24, 2011, at approximately 9:00 am, Mr. Hudson told an officer working in his dormitory that he was feeling sick due to the extreme heat. The officer wrote him a pass to go to the infirmary. Mr. Hudson left the dormitory for the infirmary.

198.  That day the temperature reached 104 degrees, with a heat index of over 106 Fahrenheit.

199.  When he arrived in the infirmary, UTMB employees failed to treat Mr. Hudson, or even do a cursory examination. Dr. Oliver, John Doe, and the nurses they supervised did not even take Mr. Hudson's vital signs. Despite complaining the extreme temperatures were making him sick, UTMB, and Dr. Oliver provided him no accommodations for his heat-sensitive disabilities.

200.  At approximately 5:00 pm, shortly before UTMB closed the infirmary for the day, Dr. Oliver, John Doe, and/or the nurses they supervised sent Mr. Hudson back to his bunk in the dormitory. No UTMB official checked his vitals, or in any way evaluated him before he left the infirmary, despite his obvious need for medical care.

201.  At a bare minimum, Dr. Oliver or John Doe grossly failed to supervise the staff of the infirmary, ensuring Mr. Hudson spent several hours in the infirmary without receiving even a

cursory medical exam. At worst, he intentionally ignored a prisoner sent by a correctional officer to the infirmary he supervised for almost eight hours.

202.  When Mr. Hudson arrived back at the dormitory, the officer on duty still believed he looked ill. She asked him if he was all right, and if he wanted to go back to the infirmary.

203.  Less than an hour later, shortly before 6:00 pm, officers found Mr. Hudson suffering convulsions and unresponsive in his bunk. His skin was hot to the touch, his face was red and flushed, and he could not speak to the officers.

204.  An officer brought a wheelchair to Mr. Hudson's bunk, and escorted him to the Gurney Unit infirmary. They arrived there shortly after 6:00 pm – right after the UTMB medical staff left for the day.

205.  Pursuant to TDCJ and UTMB practice and policy, the officers called the UTMB medical staff at the nearby Beto Unit. The officers told two licensed vocational nurses at the Beto Unit, Nancy Betts and Steven Fields, that they believed Mr. Hudson's condition was "heat related" because "he is very hot." Instead of immediately calling 911, Betts and Fields told the officers to bring Mr. Hudson to the Beto Unit for evaluation, even though they knew he was suffering convulsions, suffered from hypertension and depression, had stopped responding to officers, and was "very hot."

206.  Betts and Fields knew the correctional officers could provide simple, immediate first aid, such as packing ice around Mr. Hudson's body, or dousing him with ice water to begin bringing down his temperature. Despite knowing this first aid could save his life, they failed to tell the officers to do anything other than transport him to the Beto Unit.

207.  Before transporting Mr. Hudson to the Beto Unit infirmary, pursuant to TDCJ practice and policy, officers strip searched him and shackled him, then required a supervisor to

check the restraints. These procedures, which would not have been required before transporting Mr. Hudson to a hospital emergency room, delayed his access to medical care.

208.  TDCJ transports small number of prisoners between nearby prisons in vans. Upon information and belief, the transport vans do not have air conditioning in the back of the vans, where the prisoners are secured. TDCJ policy recognizes transporting prisoners in non-air-conditioned vehicles can be dangerous.

209.  Moreover, by 6:00 pm, the transport vans had likely been sitting in the brutally hot sun the entire day. Like any car parked outside in Texas during late July, the interior of the van would have been extremely hot when it picked up Mr. Hudson.

210.  Thus, UTMB and TDCJ's decision to take Mr. Hudson to the Beto Unit in the hot transport van dropped him from the frying pan into the fire. This deliberate policy decision made at the highest levels of the organization by the Executive Defendants placed Mr. Hudson in obviously dangerous conditions, and discriminated against him and other prisoners with heat-sensitive disabilities.

211.  Almost an hour later, Mr. Hudson finally arrived at the Beto Unit. As the officers opened the transport van, Mr. Hudson collapsed.

212.  By this time, his body temperature was 105. The nurses at the Beto Unit finally determined Mr. Hudson needed to go to an emergency room as soon as possible, and called 911.

213.  Because of the Beto and Gurney Units' remote locations, it took the ambulance over an hour to get Mr. Hudson from the prison to the hospital.

214.  Unfortunately, by the time Mr. Hudson arrived at the hospital, it was too late. As doctors tried to life-flight him to a hospital in Tyler, he suffered a heart attack. He was taken to the intensive care unit, where he died the next day.

**Kenneth James' Death**

215.  At the time of his death, Mr. James was a 52-year-old man. He was overweight, and suffered from hypertension. He had violated a probation condition, and was sentenced to serve a five-year sentence in TDCJ custody.

216.  Mr. James arrived at the Gurney Unit from the air-conditioned McLennan County Jail on or about August 10, 2011.

217.  At the Gurney Unit, a UTMB nurse noted his hypertension, and that he was taking a diuretic, hydrochlorothiazide, to treat his disability.

218.  On the day Mr. James died, the Tennessee Colony area, where the Gurney Unit is located, had endured 43 consecutive days where the temperature exceeded 100 degrees. The heat index in the Tennessee Colony area was "extremely dangerous" on 51 consecutive days before Mr. James' death.

219.  During the few days Mr. James spent at the Gurney Unit, outdoor temperatures reached 106 degrees Fahrenheit. Temperature readings taken inside the Gurney Unit the day before Mr. James died showed temperatures exceeding 101 degrees. Even at 4:00 am, the temperature inside Mr. James' dormitory was 90 degrees, without factoring in humidity.

220.  At around 5:15 pm on August 12, 2011, Officer Leonard reported to Officers Matthews and Gilmore that Mr. James needed medical attention. Matthews and Gilmore went to Mr. James' bunk and observed him. Though he was obviously extremely hot and weak, they simply called the medical department instead of escorting him to the infirmary.

221.  In the Gurney Unit infirmary, Nurse Washington, a UTMB employee, was preparing to leave for the day when his shift ended at 6:00 pm. Because he did not want to work late, he told Leonard, Matthews and Gilmore not to bring Mr. James to the infirmary. Washington instead told Matthews, Leonard and Gilmore they should just tell Mr. James to drink more water. Washington refused to even examine Mr. James to assess his condition, though he

could have easily done so. Washington intentionally denied Mr. James a simple accommodation for his disability – monitoring his heat-sensitive medical conditions. Moreover, Washington was deliberately indifferent to Mr. James' emergent medical condition.

222.  Despite knowing Mr. James needed medical attention, and that Nurse Washington refused to examine and treat him, Matthews, Leonard and Gilmore took no further action. Gilmore just told the officer relieving her, Officer Raines, that Mr. James had been "feeling dizzy" – a classic early symptom of heat stroke. The officers could have taken Mr. James to the infirmary themselves, but chose not to. They did not want to work late either. Instead, they just told Mr. James to drink more water, and left him in his bunk.

223.  Raines knew when her shift began that Mr. James was sick. At approximately 6:45 pm, she saw him sitting in the dormitory's dayroom with his shirt off, in violation of the prison's rules. Mr. James told her he was really hot, and feeling sick. Despite this, Raines ordered him to put his shirt back on. Though she knew he was "really hot," other officers had told her he was sick, and though she knew he needed help, she made no attempt to get him medical care.

224.  Several hours later, shortly after midnight, Officer Edwards saw Mr. James stumbling to the restroom, gamely trying to drink more water. He was disoriented, "wobbling back and forth as he was walking," and had urinated on himself. He could barely speak to her. Other prisoners told Edwards that Mr. James was sick, and needed care immediately. Identifying Mr. James needed immediate medical attention, Edwards called her supervisor, Sgt. Seda.

225.  Edwards told Seda over the radio that Mr. James was disoriented and had urinated on himself. Seda and Sgt. Flowers were ensuring the prisoners had been counted properly, and instead of addressing Mr. James' emergent medical condition, told Edwards to simply "keep an eye on him" as long as Mr. James was in a "secure area." Seda and Flowers went back to

counting the prisoners, and completely ignored Mr. James. Though Seda and Flowers knew Mr. James needed medical attention, they completely disregarded his escalating medical emergency.

226.  Though Edwards knew Mr. James had become extremely sick, was exhibiting signs of altered mental status, and had even urinated on himself, she simply left him in the dorm and took no further action to obtain emergency medical care.

227.  At 12:15 am, just a few minutes later, Officer Dodd saw Mr. James again stagger to the restroom to get some water. She saw him "bump[] into the wall of the restroom [and] urinal, and [begin] to stumble." Despite his obvious distress, Dodd took no action to help Mr. James.

228.  Around 1:00 am, Officer Dodd again saw Mr. James "behaving abnormally." She thought he appeared to be "drunk or on some kind of medication." He was again stumbling from his bunk to the restroom, where he was desperately trying to drink more water from the sink, as Washington advised hours earlier. Dodd also reported his condition to Sgt. Seda. Again, Seda could not be bothered to help Mr. James, and put off doing anything to obtain medical care for him. Though Dodd knew Seda was not taking any immediate action, she also simply left Mr. James alone as he urinated on himself and stumbled back and forth between the restroom and his bunk, trying to drink more water from the restroom sink.

229.  Finally, around 2:35 am, Officer Glorie Harris noticed Mr. James' rapidly deteriorating condition. By this time, Mr. James was continuing to urinate on himself, and could no longer stand up. As he walked to the restroom, he grabbed the back of a bench in the prison's dayroom to support himself. Harris called Lt. Toby Whitfield, who immediately brought a wheelchair to Mr. James' dorm so he could be taken to the infirmary.

230.  Of course, when Lt. Whitfield arrived in the infirmary with Mr. James, there was no medical staff there. Whitfield called Nurse McKnight, a UTMB employee, at the Beto Unit,

pursuant to TDCJ and UTMB's policy and practice for after-hours medical care at the Gurney Unit.

231.  Nurse McKnight told an officer to take Mr. James' temperature and blood pressure. By this time, his body temperature was a shocking 108 degrees, and his blood pressure had fallen precariously to 87/57. Though these vital signs should have indicated to a medical professional like McKnight that Mr. James was barely clinging to life, instead of calling 911 to rush Mr. James to a hospital, McKnight incredibly told the officers to bring him to the Beto Unit infirmary so she could examine him in person.

232.  In addition to not calling 911, McKnight failed to tell the officers to take basic steps, like placing bags of ice on Mr. James' body, or cooling him by pouring cold water on him, even though she knew his body temperature was a dangerously high 108.

233.  Instead, the officers began to prepare Mr. James for transport by calling the prison's transport van to the infirmary, and securing him for transport.

234.  As the officers were preparing Mr. James for transport to the Beto Unit, he collapsed and fell out of the wheelchair. Only then did officers finally call 911 – after 3:00 am, almost 10 hours after officers first noticed signs of distress.

235.  When Mr. James arrived at the hospital, his body temperature was still 108 degrees. The extreme heat caused him to suffer organ failure, and he was pronounced dead within an hour.

236.  An autopsy concluded he died of "environmental hyperthermia-related classic heat stroke" due to "lack of air conditioning, chronic illness, and use of diuretics and beta blockers." The high temperatures caused "all cellular structures" to be "destroyed" in Mr. James' body.

237.  Leonard, Matthews, Gilmore, Washington, Seda, Flowers, Edwards, McKnight and Dodd each delayed Mr. James' evaluation by medical professionals, denying him life-saving

medical care. Their deliberate indifference to his obvious need for medical attention cost him his life.

238.  Even TDCJ recognized these officers conduct was unacceptable. TDCJ charged Seda, Dodd and Edwards with failing to provide care for a sick prisoner. TDCJ took disciplinary action against Seda for failing to immediately respond to Edwards' initial report, but his only punishment was an "entry in his employee performance log." None of the other officers faced any discipline for failing to care for Mr. James.

239.  After Mr. Hudson and Mr. James died, other inmates at the Gurney Unit continued to suffer heat-related illnesses and injuries at the Gurney Unit because nothing changed.

**Rodney Adams' Death**

240.  At the time of his death, Mr. Adams was a 45-year-old man. He had been convicted of driving while intoxicated, and was sentenced to serve only four-years in TDCJ.

241.  On the day Mr. Adams died, the Tennessee Colony area, where the Gurney Unit is located, had endured 19 consecutive days where the temperature exceeded 90 degrees Fahrenheit. During the two days Mr. Adams spent at the Gurney Unit, outdoor temperatures reached 103 degrees.

242.  He arrived at the Gurney Transfer Facility from the air-conditioned Wise County Jail on August 2, 2012. That day, temperature readings taken inside the Gurney Unit showed temperatures exceeding 102 degrees Fahrenheit.

243.  There is no legitimate, rational basis for TDCJ to treat inmates incarcerated in state prisons differently from inmates incarcerated in county jails who are not exposed to extreme temperatures.

244.  A week before Mr. Adams arrived at the Gurney Unit, another prisoner had been sent to the infirmary with a heat-related illness. Two days before Mr. Adams arrived, a second

prisoner was treated in the infirmary for heat exhaustion sustained while he was in the inmate housing areas. Upon information and belief, Murray, Buskirk, Linthicum, and Goings were aware of these illnesses.

245.  When Mr. Adams arrived, a UTMB employee noted he was taking a psychotropic medication to treat depression. He had been prescribed Vistaril (also known as hydroxyzine, an antihistamine), Cymbalta (duloxetine, a selective serotonin and norepinephrine inhibitor, or SSRNI), and Cogentin (benztropine, an anticholinergic used to treat side effects of other drugs).

246.  Despite knowing Mr. Adams was taking a psychiatric medication for his disability, and that each of these drugs substantially increased his risk of heat-related illness, injury, or death, TDCJ and UTMB took no action to protect Mr. Adams from the dangerous indoor temperatures at the Gurney Unit.

247.  Mr. Adams had suicidal thoughts and experienced hallucinations when he was not taking his medications. For example, shortly after he arrived at the Wise County jail, on July 2, 2012, Mr. Adams wrote to jailers "please let me talk to MHMR about my mental problems, I am feeling the presence of death!" He later wrote "I need to see my caseworker and doctor from MHMR for my mental state. I am hearing and seeing people and voices."

248.  Mr. Adams' medication was necessary to protect his mental health from his disability. Without it, he was unable to perform major life activities like caring for himself, sleeping, concentrating, and thinking.

249.  On the afternoon of August 3, 2012, the Tennessee Colony area experienced temperatures over 90 degrees until after 10pm. That day, the heat in Tennessee Colony was sweltering – 102 degrees Fahrenheit, with 38 percent humidity. According to NOAA's chart, which TDCJ and UTMB rely upon, temperatures this high makes heat stroke "possible," and are "dangerous."

250.  That day, at approximately 4:15 pm, a prisoner in the same building as Mr. Adams became ill due to the heat. Officers saw the prisoner was sick, and called on their radio for medical assistance. They knew heat had likely contributed to the prisoner's illness. The prisoner was taken to the prison's infirmary.

251.  Warden Goings would have known this other prisoner became sick in Mr. Adams' building, and needed medical treatment. Despite other prisoners becoming sick that afternoon due to the heat, Goings took no action to even see if other prisoners, like Mr. Adams, needed help.

252.  Shortly thereafter, Mr. Adams returned from eating at the cafeteria with the other men housed in his dorm. Suffering from the extreme temperatures, he began to feel dizzy, and sat down. He fell backwards on to his bunk.

253.  At that time, the temperature inside his dorm was over 100 degrees, without considering the effect of humidity. That afternoon, officers had recorded a temperature of 103 degrees insider Mr. Adams' dorm, without considering the effect of humidity. TDCJ recorded an outside heat index of 113 shortly before Mr. Adams collapsed.

254.  Shortly before 6:00 pm, Mr. Adams suffered a heat stroke, and his body began convulsing. Other prisoners began to call for help by pressing the emergency call button in the dormitory.

255.  Shortly after 6:00 pm, Officers Staycee Gibson and Damien Clark came on duty. They heard the prisoners in Mr. Adams' building yelling for help. Clark went in to the dormitory and found Mr. Adams collapsed on his bunk. Mr. Adams was convulsing, and unresponsive. Clark told Gibson to call for medical staff and a supervisor.

256.  Nurses did not arrive for ten minutes. At that time, the nurses assessed Mr. Adams, and found his body was extremely hot.

257. At about 6:15 pm, Mr. Adams was taken on a stretcher to the Gurney Unit's infirmary. His body temperature was 109.9 degrees, he was vomiting, and his breath was very shallow. Only then did the nurses finally call 911.

258. The EMTs, who arrived around 6:25 pm, noted Mr. Adams' body was "very hot to the touch."

259. Even though Warden Goings, Eason, Linthicum, Murray, Buskirk, Livingston, Thaler, and Stephens all knew that delays in providing medical care to prisoners suffering heat stroke could be deadly, and had seen ten men die the previous summer, they would not let correctional officers call 911 before a prisoner is evaluated by a nurse. This known hazardous practice prevented Mr. Adams from timely receiving care.

260. When EMS left the prison, Mr. Adams was taken to the Palestine Regional Medical Center. When he arrived there, his body temperature was 107.9 degrees. Doctors diagnosed him with "severe hyperthermia."

261. Shortly before midnight, he was transferred by helicopter to the East Texas Medical Center. When he arrived, his temperature had only come down to 104 degrees, despite his body being packed in ice and doctors administering IVs of cold fluid.

262. Doctors at the East Texas Medical Center noted his "overall prognosis was very poor and critical." He was diagnosed with "heat stroke" causing "severe brain injury," and "respiratory failure." The extreme heat caused him to suffer organ failure, and life support was withdrawn after doctors consulted with Ms. Adams. He passed away shortly thereafter.

263. A doctor who evaluated Mr. Adams at the Medical Center wrote this was "a very unfortunate situation of a 45-year-old inmate who was apparently perfectly well," until he was exposed to "the extremely hot conditions within the holding tank" at the prison.

264.  An autopsy concluded he died of "hyperthermia," or heat stroke, resulting in multi-system organ failure.

CAUSES OF ACTION

A. EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(By All Plaintiffs, as to Defendants Livingston, Thaler, Stephens, Eason, Murray, Goings and Miller Only, in Their Individual Capacities) (42 U.S.C. §1983)

265.  Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

266.  By subjecting Mr. Hudson, Mr. James, and Mr. Adams to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray acted with deliberate indifference to the deceased men's serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

267.  Further, Dr. Murray, and the practices and policies for which he is responsible, (including not placing housing restrictions on inmates vulnerable to the heat, not providing intake physicals for inmates when they first arrive for extended periods of time despite the dangers they face, not providing medical care on site from 7:00 p.m. to 9:00 a.m. despite knowing the dangers extremely hot conditions present, having licensed vocational nurses providing treatment when they are not competent to do so, and inadequately training staff to recognize the signs of heat stroke and the immediate need for treatment), is deliberately indifferent to inmates' vulnerability to heat generally and to the decedents in this case specifically.

268.  The Executive Defendants failure to stop these dangerous practices (all of which they actually knew of at the time of the decedents' deaths at the Gurney Unit) endangered the

decedents and violated their rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, proximately causing the deaths of Plaintiffs' decedents.

269.    Accordingly, the individual defendants are liable to the Plaintiffs under 42 U.S.C. § 1983.

## B. EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(By Adams Plaintiffs, as to Defendants Linthicum and Buskirk Only,
in Their Individual Capacities) (42 U.S.C. §1983)

270.  The Adams Plaintiffs incorporate the previous paragraphs as if alleged herein, and further pleads:

271.  By subjecting Mr. Adams to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Linthicum and Buskirk acted with deliberate indifference to Mr. Adams' serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

272.  Further, Dr. Linthicum and Dr. Buskirk, and the practices and policies for which they were responsible, (including not placing housing restrictions on inmates vulnerable to the heat, not providing intake physicals for inmates when they first arrive for extended periods of time despite the dangers they face, and inadequately training staff to recognize the signs of heat stroke and the immediate need for treatment), were deliberately indifferent to inmates vulnerable to heat generally and to Mr. Adams specifically.

273.  Linthicum and Buskirk's failure to stop these dangerous practices (all of which they actually knew of at the time of Mr. Adams' death at the Gurney Unit) endangered Mr. Adams and violated his rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, proximately causing his death.

274.   Accordingly, the Linthicum and Buskirk are liable to the Adams Plaintiffs under 42 U.S.C. § 1983.

### C. EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
(By Hudson Plaintiffs as to Defendants Oliver, Doe, Betts, and Fields Only, in Their Individual Capacities) (42 U.S.C. §1983)

275.  Cade Hudson incorporates the previous paragraphs as if alleged herein, and further pleads:

276.  Oliver and Doe failed to provide Mr. Hudson medical care when he arrived in the Gurney Unit infirmary on the morning of July 24, 2011. Though he was sent by a correctional officer to the infirmary to receive medical treatment, Oliver and Doe failed to even take his vital signs or perform any examination. This deliberate and knowing refusal to provide Mr. Hudson care for his serious medical condition resulted in his death.

277.  Furthermore, Dr. Oliver, as the supervising physician at the infirmary, failed to supervise the medical staff operating under his supervision. This failure to supervise resulted in patients like Mr. Hudson not receiving basic medical care. In Mr. Hudson's case, the failure to provide basic care (such as checking his vital signs) proximately resulted in his death.

278.  Likewise, when officers reported to Betts and Fields that Mr. Hudson was extremely hot and unresponsive – classic symptoms of an emergent heat stroke known to Betts and Fields – they deliberately and knowingly delayed Mr. Hudson's access to health care for his serious medical condition for over an hour by choosing to transport him to the Beto Unit's infirmary instead of directly to an emergency room.

279.  Betts and Field's deliberate indifference to Mr. Hudson's serious medical condition directly and proximately resulted in his death.

280.  Accordingly, the individual defendants are liable to the James Plaintiffs under 42 U.S.C. § 1983.

### D. EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
(By James Plaintiffs as to Defendants Miller, Leonard, Matthews, Gilmore, Raines, Washington, Seda, Flowers, Edwards, McKnight, and Dodd Only, in Their Individual Capacities) (42 U.S.C. §1983)

281.     The James Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

282.     Leonard, Matthews, Gilmore, Raines, Washington, Seda, Flowers, Edwards, McKnight and Dodd all deliberately failed to provide Mr. James medical care for his serious medical condition, causing his death. Though each Defendant observed or otherwise knew Mr. James was extremely hot, disoriented, dehydrated, had urinated on himself, and was otherwise behaving strangely, they each deliberately ignored his condition, failing to provide him urgently needed medical care. This deliberate and knowing refusal to provide medical care proximately caused Mr. James' untimely death.

283.     Moreover, Miller grossly failed to supervise the officers under his command at the Gurney Unit to ensure they accommodated prisoners suffering from the heat, and immediately provided medical care to prisoners suffering emergent symptoms of heat stroke.

284.     Likewise, Miller knew of, ratified, and otherwise approved the decision to require prisoners be taken to the Beto Unit infirmary instead of directly to a hospital during medical emergencies. This practice caused unconscionable delays proximately resulting in Mr. James' death.

285.     Accordingly, the individual defendants are liable to the Plaintiffs under 42 U.S.C. § 1983.

E. EIGHTH AND FOURTEENTH AMENDMENT DENIAL OF MEDICAL CARE
(By Adams Plaintiffs as to Defendants Goings, Only, in His Individual Capacity) (42 U.S.C.
§1983)

286.    The Adams Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

287.    In addition to the claims alleged above, Goings knew prisoners were suffering heat-related illnesses at the Gurney Unit shortly before Mr. Adams' death, including one illness a few hours before Mr. Adams' collapse.

288.    Despite actual knowledge prisoners at the Gurney Unit were suffering heat-related illnesses, and that two men had died the previous summer, Goings did nothing to protect inmates like Mr. Adams from harm. This failure proximately caused Mr. Adams' death.

289.    Likewise, Goings knew of, ratified, and otherwise approved the decision to require prisoners be examined by a nurse before 911 was called during medical emergencies. This practice caused unconscionable delays proximately resulting in Mr. Adams' death.

290.  Accordingly Goings is liable to the Adams Plaintiffs under 42 U.S.C. § 1983.

F.    AMERICANS WITH DISABILITIES ACT, AMERICANS WITH
DISABILITIES ACT AMENDMENT ACT, AND REHABILITATION ACT
(By all Plaintiffs, as to Defendants TDCJ, and UTMB Only)

291.  TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

292.  Further, Title II of the ADA and the ADA Amendments Act apply to TDCJ and UTMB and have the same mandate as the Rehabilitation Act. 42 U.S.C. §12131 *et seq*.

293. Title II of the ADA and the ADA Amendments Act protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eight and Fourteenth Amendments of the U.S. Constitution.

294. The Gurney Unit and other TDCJ units are facilities, and their operation comprises a program and service for Rehabilitation Act, ADA, and ADAAA purposes. The three deceased men were otherwise qualified to participate in the programs and services at the Gurney Unit, provided by TDCJ and/or UTMB.

295. For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Mr. Hudson, Mr. James, and Mr. Adams were qualified individuals regarded as having a physiological or mental impairment that substantially limited one or more of their major life activities.

296. Defendants TDCJ and UTMB knew Mr. Hudson, Mr. James, and Mr. Adams suffered from hypertension and/or depression, and were prescribed medications to treat their disabilities. Despite their knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that untimely ended their lives.

297. As alleged above, TDCJ and UTMB deliberately failed to and refused to reasonably accommodate Mr. Hudson, Mr. James, and Mr. Adams, while in custody, in violation of the ADA, ADAAA and Rehabilitation Act. That failure and refusal caused their deaths.

298. As shown above, TDCJ and/or UTMB failed, and refused, to reasonably modify their facilities, services, accommodations, and programs to reasonably accommodate the deceased's disabilities. These failures and refusals caused their deaths.

299. Mr. Hudson, Mr. James, and Mr. Adams died as a direct result of TDCJ and UTMB's intentional discrimination. The Plaintiffs are entitled to the maximum amount of damages allowed by law.

### G.  NEGLIGENCE – TEXAS TORT CLAIMS ACT

#### TRANSPORT VANS
(For the Hudson and James Plaintiffs only, as to Defendants TDCJ and UTMB)

300. As described above, TDCJ and UTMB employees used a hot transport van, a motor-driven vehicle owned by the state, to transport Mr. Hudson and Mr. James from the Gurney Unit infirmary to the Beto Unit infirmary.

301. Use of these transport vans was dangerous and contributed to Mr. Hudson and Mr. James' deaths.

302. Moreover, TDCJ and UTMB employees knew, or should have known, that at the moment they decided to transport Mr. Hudson and Mr. James that their serious medical conditions required immediate transport to an emergency room, not transport in an extremely hot van to an adjacent prison infirmary where they could not possibly receive competent medical treatment.

303. TDCJ and UTMB had actual notice that Mr. Hudson and Mr. James died as a result of the use of the extremely hot transport vans, and a subjective awareness that their fault contributed to the men's deaths.

304. Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

#### PREMISES LIABILITY
(For the Hudson, James, and Adams Plaintiffs, as to TDCJ)

305. Plaintiuffs incorporate the foregoing as if alleged herein:

306.  The conditions in which TDCJ housed Mr. Hudson, Mr. James, and Mr. Adams at Gurney, namely the extreme heat inside the housing area, were dangerous and constitute premises liability under Texas law.

307.  TDCJ controlled and maintained the Gurney Unit housing areas, TDCJ officials actually knew that conditions in the housing area were extremely dangerous and were especially dangerous for heat-vulnerable individuals like Mr. James, Mr. Hudson, and Mr. Adams.

308.  This condition, the extreme heat inside the housing area, posed an unreasonable risk of harm to the decedents, constituted a breach of TDCJ's duties to exercise reasonable care and protect prisoners from known dangers, and was a proximate cause of the decedents' deaths.

309.  TDCJ knowingly failed to remedy the dangerous condition or warn the decedents how to safely avoid the dangerous, extreme heat.

310.  As TDCJ had actual notice that Mr. Hudson, Mr. James and Mr. Adams died as a result the dangerous condition to which they were subjected, and a subjective awareness that their fault contributed to the men's deaths, TDCJ's immunity is waived.

311.  Likewise, Mr. Adams served TDCJ with notice of his claim within six months of his death.  Thus, TDCJ's immunity is waived on this basis as well.

I.    NEGLIGENCE – TEXAS TORT CLAIMS ACT

PRESCRIPTION DRUGS
(As to Defendant UTMB)

312.  As described above, UTMB employees negligently used personal property, the prescription drugs prescribed Plaintiffs' decedents, to treat their disabilities.

313.  Use of these prescription drugs was dangerous and contributed to Mr. Hudson, Mr. James, and Mr. Adams' deaths.

314. Moreover, UTMB employees knew, or should have known, that at the moment they prescribed the drugs that the medications substantially increased the Plaintiffs' decedents' risk of suffering fatal heat strokes.

315. UTMB had actual notice that Plaintiffs' decedents died as a result of the use of the prescription drugs, and a subjective awareness that their fault contributed to the men's deaths.

316. Thus, no exceptions to the waiver of sovereign immunity under the Texas Tort Claims Act apply.

## DAMAGES

317. Mr. Hudson's, Mr. James', and Mr. Adams' survivors are entitled to compensatory and punitive damages against the Defendant individuals in the maximum amounts allowed by law.

318. Mr. Hudson's, Mr. James', and Mr. Adams' survivors are entitled to compensatory damages against TDCJ and UTMB in the maximum amounts allowed by the ADA, ADAAA, and Rehabilitation Act.

319. As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to, and the wrongful death of Douglas Hudson, Kenneth James, and Rodney Adams, the Plaintiffs assert claims under 42 U.S.C. § 1983, the ADA, ADAAA, and the Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

320. More particularly, Plaintiff Ashley Adams, as heir at law to the Estate of Rodney Adams, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;

- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, and Rehabilitation Act, or as allowed by law.

321.   Plaintiffs Ashley Adams and Wanda Adams, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Rodney Adams; and,
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the ADA, ADAAA and Rehabilitation Act, or as allowed by law.

322.   Plaintiffs Carlette Hunter James, Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans, as heirs at law to the Estate of Kenneth Wayne James, assert a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the ADA, ADAAA, the Rehabilitation Act, or as allowed by law.

323.   Plaintiffs Estate of Mary Lou James, Carlette Hunter James, Kristy James, Krystal James, Kendrick James, Arlett James, Jonathan James, and Kenneth Evans, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Kenneth Wayne James; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, ADAAA, the Rehabilitation Act, or as allowed by law.

324.  Plaintiff Cade Hudson, as heir at law to the Estate of Douglas Hudson, asserts a survival claim on behalf of the estate, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- past and future lost wages;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, ADAAA, the Rehabilitation Act, or as allowed by law.

325.  Plaintiff Cade Hudson, in his individual capacity asserts wrongful death claims, having incurred damages including, but not limited to, the following:

- past and future mental anguish;
- past and future loss of companionship, society, services, and affection of Douglas Hudson; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, the Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

326.  Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs.  Plaintiffs also request attorneys' fees, costs, and expenses against TDCJ and UTMB for their ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.  Award compensatory damages, against Defendants to Plaintiffs;

B.  Award punitive damages against the Defendant individuals, only, under Section 1983 and the Wrongful Death Act, and through the Texas Survival Statute to the Plaintiffs;

C.  Find that Plaintiffs are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.  Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled, separately or collectively.

Dated: July 24, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, TX 78702
 Tel.   512-623-7727
 Fax.  512-623-7729
By ____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel
Scott Medlock
State Bar No. 24044783

Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
 (512) 474-5073 [phone]
 (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that a copy of this document has been served on all counsel of record through the Court's electronic filing system.

By ____/s/ Jeff Edwards_____
JEFF EDWARDS